Hayward BROWN, Petitioner,

v.

Norman CARLSON and George Ralston, Respondents.

Harold Louis WALLS, Petitioner,

v.

George RALSTON and Norman Carlson, Respondents.

Norman WEAVER, Petitioner,

v.

George RALSTON and Norman Carlson, Respondents.

Nos. 75–C–493, 75–C–607 and 75–C–544.

United States District Court, W. D. Wisconsin.

May 6, 1977.

Michael R. Davis, Madison, Wis., for petitioner Brown.

David C. Mebane, U. S. Atty., W. D. Wisconsin, Madison, Wis., Patrick J. Glynn, S. Cass Weiland, U. S. Dept. of Justice, Washington, D. C., for respondents Carlson and Ralston.

Harold Louis Walls, pro se.

Norman Weaver, pro se.

## ORDER

JAMES E. DOYLE, District Judge.

These are petitions for writs of habeas corpus properly before this court by virtue of 28 U.S.C. § 2241 (1970). Petitioners are currently inmates at the Federal Correctional Institution, Oxford, Wisconsin. They were sentenced pursuant to 18 U.S.C. § 5010(c), which is a part of the Federal Youth Corrections Act (YCA). 18 U.S.C. §§ 5005–5026. Each petitioner alleges that Oxford is not the type of institution specified in the YCA for his confinement. In addition, petitioner Brown alleges that he has not been sent to a classification center or agency before being sent to a designated institution despite the requirements of 18 U.S.C. § 5014. Because the issue presented in each of these petitions regarding the propriety of each petitioner's confinement at Oxford is identical, I have consolidated the petitions for the purposes of this opinion. I now "dispose of the matter as law and justice require." 28 U.S.C. § 2243.

## FACTS

On the basis of the entire record in each case, I find as fact those matters set forth in this section of this opinion.

On January 19, 1954, the Deputy General of the United States issued a memorandum (memo no. 64) to the clerks of the United States District Courts, the United States Attorneys, the United States Marshals, and the United States Probation Officers, informing them that the Director of the Bureau had certified, pursuant to 18 U.S.C. § 5012, that proper and adequate treatment facilities and personnel were available for the implementation of the YCA for the judicial districts of the First, Second, Third, Fourth, Fifth (except for districts in Texas and Louisiana), Sixth and Seventh Circuits. The memorandum stated that the availability of facilities for commitment of youths from the remaining districts would be announced as soon as possible. The memorandum continued:

"The Federal Correctional Institution at Ashland, Kentucky, is being converted into a Classification Center and treatment facility for youth offenders as contemplated by the Act, and most youths between the ages of 18 and 22 will be

committed to this institution. The National Training School for Boys, Washington, D. C. will be designated for selected youth offenders. Under exceptional circumstances and where the youth presents an unusual custody risk, the Federal Reformatory, Chillicothe, Ohio may be designated initially."

On October 4, 1956, the Attorney General issued another memorandum (memo no. 62, supplement No. 1) to the same addressees, informing them that the Director had certified that proper and adequate treatment facilities and personnel were available for the implementation of the YCA for the judicial districts of the Eighth, Ninth (except for Alaska, Hawaii, and Guam), and Tenth Circuits, and for the districts of Texas and Louisiana. The memorandum continued:

"The Federal Correctional Institution at Englewood, Colorado, is being converted into a classification center and treatment facility for youth offenders as contemplated by the Act, and most youths between the ages of 18 and 22 sentenced under the provisions of the Act from the districts listed above will be committed to this institution. Under exceptional circumstances and particularly where the youth presents an unusual custody risk, the Federal Reformatory, El Reno, Oklahoma, may be designated."

On June 16, 1975, the Director issued a policy statement (number 7300.13E) on the subject of "delegation of transfer authority." By this statement, the Director delegated to the chief executive officer of each federal facility, and to the Bureau's regional director of the appropriate region, the power to transfer offenders from one federal institution to another or to an approved non-federal facility. The policy statement included general guidelines, a statement of limitations and regulations, a statement on relationship with other governmental agencies, and a statement of procedures, to assist those to whom the transfer authority was being delegated. Also, attached to the policy statement was an appendix which provided current information as to the mission of each federal correctional institution and described the population, characteristics, commitment areas, security limitations, and significant program resources of each institution. The delegatees were instructed to preserve the integrity of the missions of the respective institutions when selecting an institution as the place to which a particular offender was to be transferred.

The policy statement's guidelines provide that a "significant number of transfers will be for the purpose of placing newly committed offenders in institutions for which they more properly classify." They provide that at "an inmate's initial classification, the staff should attempt to plan a complete program for the entire period of confinement, including both institutional and postrelease phases," and that in making the plan, "all of the resources of the Federal Prison System should be considered." Also, they state that generally, "transfer consideration is most appropriately given at the time of intake screening, initial classification, or at regularly scheduled interviews." They instruct that transfer should be considered when it becomes apparent that the offender's program or other needs will be best served by the programs at another facility, when the continuity of a training program or treatment program or both requires it, and when the resources of the present institution are inadequate to meet the offender's needs. It appears from the policy statement that more particular reasons for transfers may include: that the transferee institution is geographically closer to the point at which the offender is to be released; that poor institutional adjustment or attempts at escape indicate the need for closer supervision and controls; that medical attention is required or that it has been completed; that work release or study release is possible at the transferee institution; that the transferee is a community center; that overcrowding at the transferor institution requires it; or that there is a need to build up the population at the transferee institution.

With specific reference to the YCA, policy statement 7300.13E provides:

"*Youth Corrections Act* commitments shall be classified at the receiving institution, where the initial parole hearing will also be given. Following this hearing, or any appropriate time thereafter, the youth offender may be transferred by delegated authority to another more appropriate *youth* institution without referral to the Regional Case Management Branch. Youth offenders recommended for an adult correctional facility at the time of initial classification or at any later date, shall be referred to the Regional Administrator, Case Management Branch for approval. [At this point reference is made to another portion of policy statement 7000.13E relating to the timing of transfers in relation to initial parole hearings for YCA offenders. The reference does not appear to be pertinent to the issues in the present cases.]

"Any youth offender, having once been authorized for transfer to an adult Federal Correctional Institution, may be transferred under delegated authority to some other, more appropriate, adult FCI. However, any youth offender authorized for transfer to a penitentiary by the Regional Office may not be transferred to another penitentiary under delegated authority; each transfer of this nature must be approved by the Regional Case Management Branch."

In the descriptions of individual correctional institutions embodied in Appendix A to policy statement 7300.13E, there are occasional references to YCA, but there is no systematic statement of those to which YCA offenders may or may not be committed initially or transferred. As to Oxford specifically, there is no reference to YCA; it is said that the "population is composed of medium to long term young male adults," that Oxford is not suitable for juvenile offenders and that the age range is "21 to 28 at time of commitment."

Among the 56 institutions operated by the Bureau of Prisons, there are 12 facilities which are classified either as juvenile and youth institutions (4) or as young adult institutions (8).

Apparently as a matter of operating policy, not made explicit in memorandum no. 64, memorandum no. 62 (supplement no. 1), or policy statement number 7300.13E, above, the Bureau has designated these 12 institutions as the standard institutions for initial commitment of prisoners sentenced under the YCA.

The Bureau does not maintain any institution which is used exclusively for prisoners serving YCA sentences (hereafter referred to as "YCA offenders"). At least 27 percent of the population of each Bureau of Prisons institution is composed of prisoners serving adult sentences (that is, sentences not imposed under YCA).

The Federal Correctional Institution, Oxford, Wisconsin, is classified as a medium security young adult institution. The inmates at Oxford are persons who have been committed to medium and long-term sentences, and they have an age range of 21 to 28 years at the time of commitment. The average age of all inmates at Oxford on May 5, 1976, was 24.98 years.

Among the May 5, 1976, population at Oxford, 12 percent of the inmates were serving commitments under YCA sentencing provisions and the remaining inmates were serving commitments under adult sentencing provisions. Persons serving YCA sentences at Oxford are not separated from those serving adult sentences, either in their treatment programs or in their housing units.

The Bureau does not maintain any institutions which are used exclusively as centers for initial study or classification of prisoners, but instead uses each of its institutions as the site of a classification center for prisoners designated to serve sentences there. It is an infrequent occasion on which, either before or after the admission and orientation program at such institution has been completed, the initial designation of an institution for service of sentence is changed because it has been determined that an improper designation has been made.

Upon arrival at Oxford, new inmates are placed in an admission and orientation pro-

gram, which lasts approximately three weeks and which provides new inmates with information about the treatment programs available at the institution. The new inmates are given physical and dental examinations, and undergo educational and psychological testing.

At the conclusion of the admission and orientation period at Oxford, an inmate is assigned to one of three functional units there, on the basis of an evaluation by the institution's psychology department of the personality traits observed and studied by the case manager, correctional counselor, and unit officer during the admission and orientation period. The three functional units at Oxford are divided into: (1) the most manipulative and criminally oriented inmates; (2) the inmates least likely to revert to crime when released; and (3) an intermediate group of inmates. About two weeks after an inmate has been assigned to one of the three functional units, a classification interview is provided him by four staff members to discuss his treatment needs, goals, and institutional program preferences. No distinction is made between YCA and non-YCA offenders in the course of this admission, orientation, and assignment procedure.

Oxford was originally designed architecturally by the State of Wisconsin as an institution for youth offenders, and since its acquisition by the Federal Bureau of Prisons it has always been used by the Bureau as an institution for youthful offenders. The ratio of inmates to case managers is 63 to 1, and to counselors 75 to 1. At federal adult institutions, equivalent ratios on the average are 100 to 1, and 85 or 90 to 1.

The rehabilitative programs available to inmates at Oxford include adult basic education, general educational development, 11 college courses (for the spring semester of 1976) taught by the faculty of the University of Wisconsin at Baraboo, one group counselling program conducted by a clinical psychologist, additional group counselling programs, vocational training in food management leading to an associate of arts degree, vocational training in drafting, transactional analysis group therapy, a self-improvement organization seminar conducted by inmates, a self-improvement seminar conducted by outside consultants, and federal prison industries training in plastic products manufacturing and electronic cable assembly.

Inmates are not assigned to the various programs. The inmates are responsible for voluntary selection and participation in programs. YCA offenders are given no priority in these programs.

The Bureau has determined that the 12 institutions which it designates for the confinement of YCA offenders, and the treatment programs made available there to YCA offenders, meet the requirements of the YCA. Based upon criteria of age, offense, prior record, security requirements, and special treatment needs, the Bureau has determined that many other offenders not sentenced under YCA, will also benefit from confinement in the same institutions, and from the opportunity to participate in the same treatment programs. Therefore, the members of the latter category (which is far more numerous than the YCA offender category) are confined in the same institutions and are given the opportunity to participate in the same treatment programs as those designated for YCA offenders.

As of spring 1976, there were approximately 2700 YCA offenders in confinement in the United States. If they were confined in a few institutions, perhaps five, from which all other offenders were excluded, it would be more difficult in some degree to maintain ties with their families and communities than it is when YCA offenders are distributed among 12 institutions.

With respect to administrative remedies, although the records in these cases are not explicit, the parties appear to agree, and I find, that the administrative procedures available to these petitioners are as they are described in *Cravatt v. Thomas*, 399 F.Supp. 956, 961 (W.D.Wis.1975).

*75–C–493*

On July 30, 1975, petitioner Brown was convicted of possession of: 3 unregistered

destructive devices (Molotov cocktails); destruction by explosion of a Planned Parenthood clinic in Detroit, Michigan; and causing personal injury to a doctor. On the date of conviction, petitioner Brown was 20 years old. He has no other adult convictions. He has served one juvenile commitment for breaking and entering, and has been arrested several times. On July 30, 1975, he was sentenced by the United States District Court for the Eastern District of Michigan to an 8-year commitment "for treatment and supervision pursuant to Title 18, U.S.C. § 5010(c)."

After being temporarily detained one day at the Oakland County Jail, Pontiac, Michigan, and eight days at the Federal Correctional Institution, Milan, Michigan, petitioner was transported to the Federal Correctional Institution, Oxford, which was designated by the Bureau of Prisons as the place for service of petitioner's sentence. At no time prior to incarceration at Oxford was petitioner committed to any classification center or agency for study and analysis.

Upon arrival at Oxford, petitioner was placed in the institution's admission and orientation program. At the conclusion of that program petitioner was placed in the functional unit provided for those inmates considered to be the most manipulative and criminally oriented.

Petitioner Brown has participated in several educational programs since his arrival at Oxford. He has not been separated from inmates serving adult sentences in either his treatment programs or in his housing unit.

## 75–C–544

Petitioner Weaver was found guilty of armed bank robbery. On the date of conviction, petitioner Weaver was 23 years old. The United States District Court for the Northern District of Ohio, Eastern Division, found that he was "suitable for handling under the Federal Youth Correction Act as a young adult offender, Title 18, Section 4209, U.S.C." and on June 18, 1975, sentenced him to a term of imprisonment of eight and one-half years, pursuant to 18 U.S.C. § 5010(c).

On July 1, 1975, petitioner Weaver was delivered to the Federal Correctional Institution at Milan, Michigan. On August 20, 1975, he was transferred to the Federal Correctional Institution, Oxford. Petitioner has not been separated from inmates serving adult sentences in either his treatment programs or his housing unit.

## 75–C–607

On April 7, 1975, petitioner Walls was sentenced by the United States District Court for the District of Minnesota pursuant to 18 U.S.C. § 5010(c). On April 17, 1975, he was delivered to the Federal Correctional Institution at Oxford, Wisconsin. He has not been separated from inmates serving adult sentences in either his treatment programs or his housing unit.

## OPINION

In 75–C–493 and 75–C–544 respondents contend that since petitioners have not exhausted their administrative remedies, their claims should not be considered by this court at this time.[1]

In the absence of a statutory requirement, the application of the exhaustion doctrine to a particular case is within the court's discretion. *Cravatt v. Thomas*, 399 F.Supp. 956, 968 (W.D.Wis.1975). The more closely the particular administrative procedures resemble court procedures, the more forceful the argument that the aggrieved party should be required to exhaust those procedures. Inmate grievance procedures differ from court procedures in significant respects. Accordingly, respondents in cases such as these must "make a showing of particularized need" that an inmate should be required to exhaust the inmate grievance procedures. *Cravatt* at 969. Respondents have failed to make this showing.

1. I conclude that the controversies in these cases satisfy the criteria for ripeness set forth in *Cravatt v. Thomas*, 399 F.Supp. 956, 965–966 (W.D.Wis.1975).

■ Respondents make two somewhat contradictory arguments. The first is that since the petitioners are seeking a transfer to another institution which is more suitable for service of their sentence, the issue is factual, and the Bureau should be given the opportunity to consider whether the facts of each petitioner's particular case warrant a transfer. This argument views the petitions too narrowly. They are not simply claims by members of the general population of the federal correctional institutions system that in their particular cases one existing correctional institution is more suitable than another, but rather they are claims that respondents are failing to confine them as YCA offenders in the kind of institution, and to afford them the kind of programs, which Congress directed. Even were I to view petitioners' claims so narrowly, respondents have made no showing that the procedures available to petitioners would serve as adequate fact-finding vehicles, or that the administrative record would provide any assistance in the course of subsequent judicial inquiry.

■ Respondents' second argument is that even though this court might generally be reluctant to require exhaustion absent a more formal administrative procedure, a more formal procedure is not necessary in these cases because the thrust of petitioners' contentions is directed at the legality of a general Bureau policy, rather than at factual determinations by the Bureau in the particular cases. But if the issue in question in these cases is purely legal, a requirement of exhaustion is inappropriate. *Cravatt, supra,* at 970.

I conclude that exhaustion of the Bureau's grievance procedures should not be required in these cases.

A. The statutory scheme.

Section 4082 of Title 18, which was enacted long before 1950, when the YCA became law, provides in part:

"(a) A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served.

"(b) The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise, and whether within or without the judicial district in which the person was convicted, and may at any time transfer a person from one place of confinement to another."

The Attorney General has delegated to the Director of the Bureau of Prisons the power to designate places of confinement conferred by § 4082. 28 C.F.R. § 0.96(c).

The YCA sets forth for the discretionary use of federal judges a system for the sentencing and treatment of eligible young offenders. As defined in 18 U.S.C. §§ 5006(e) and (f), a "youth offender" is a person under the age of twenty-two at the time of conviction, and a "committed youth offender" is one who is sentenced pursuant to 18 U.S.C. §§ 5010(b) or (c):

"(b) If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment under applicable provisions of law other than this subsection, the court may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter until discharged by the Commission as provided in section 5017(c) of this chapter; or

"(c) If the court shall find that the youth offender may not be able to derive maximum benefit from treatment by the Commission prior to the expiration of six years from the date of conviction it may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter for any further period that may be authorized by law for the offense or offenses of which

he stands convicted or until discharged by the Commission as provided in section 5017(d) of this chapter."

Sections 5017(c) and (d) provide:

"(c) A youth offender committed under section 5010(b) of this chapter shall be released conditionally under supervision on or before the expiration of four years from the date of his conviction and shall be discharged unconditionally on or before six years from the date of his conviction.

"(d) A youth offender committed under section 5010(c) of this chapter shall be released conditionally under supervision not later than two years before the expiration of the term imposed by the court. He may be discharged unconditionally at the expiration of not less than one year from the date of his conditional release. He shall be discharged unconditionally on or before the expiration of the maximum sentence imposed, computed uninterruptedly from the date of conviction."

Under certain circumstances a federal judge may also sentence young adult offenders (offenders between the ages of 22 and 25, inclusive, at the time of conviction) pursuant to the provisions of the YCA. 18 U.S.C. § 4216.

Section 5014 states, in part:

"Classification studies and reports

"The Director shall provide classification centers and agencies. Every committed youth offender shall first be sent to a classification center or agency. The classification center or agency shall make a complete study of each committed youth offender, including a mental and physical examination, to ascertain his personal traits, his capabilities, pertinent circumstances of his school, family life,

any previous delinquency or criminal experience, and any mental or physical defect or other factor contributing to his delinquency. In the absence of exceptional circumstances, such study shall be completed within a period of thirty days." [2]

Section 5015(a) states:

"(a) On receipt of the report and recommendations from the classification agency and Director may—

"(1) recommend to the Division [now to the Parole Commission] that the committed youth offender be released conditionally under supervision; or

"(2) allocate and direct the transfer of the committed youth offender to an agency or institution for treatment; or

"(3) order the committed youth offender confined and afforded treatment under such conditions as he believes best designed for the protection of the public."

Section 5011 provides:

### "TREATMENT

"Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed

---

**2.** At the time each of these petitioners was sentenced, the remainder of Section 5014 read: "The agency shall promptly forward to the Director and to the Division a report of its findings with respect to the youth offender and its recommendations as to his treatment. At least one member of the Division, or an examiner designated by the Division, shall, as soon as practicable after commitment, interview the youth offender, review all reports concerning him, and make such recommendations to the Director and to the Division as may be indicated." These provisions have since been modified to provide that the agency report go to the Parole Commission and that the youth offender receive a parole interview promptly after commitment.

youth offenders shall be segregated according to their needs for treatment."

Section 5012 provides:

"No youth offender shall be committed to the Attorney General under this chapter until the Director shall certify that proper and adequate treatment facilities and personnel have been provided."

Other pertinent provisions of the YCA will be referred to in the following discussion.

### B. The Congressional history.

The legislative history reveals that the YCA was the outgrowth of studies which concluded that the period of life between 16 and 22 years of age is the time when special factors operate to produce habitual criminals.[3] Then existing methods of dealing with criminally inclined youths were found inadequate in avoiding recidivism.

"By herding youth with maturity, the novice with the sophisticate, the impressionable with the hardened, and by subjecting youth offenders to the evil influences of older criminals and their teaching of criminal techniques, without the inhibitions that come from normal contacts and counteracting prophylaxis, many of our penal institutions actively spread the infection of crime and foster, rather than check, it." H.R.Rep. No. 2979, 81st Cong., 2d Sess. (1950) (hereinafter H.R.Rep. No. 2979); 1950 U.S.Code Cong. Service, p. 3985.

■■■ As a result of this dissatisfaction with existing methods of dealing with young offenders, Congress established a system of sentencing and treatment designed to:

" . . . promote the rehabilitation of those who in the opinion of the sentencing judge show promise of becoming useful citizens, and so will avoid the degenerative and needless transformation of many of those persons into habitual criminals. . . . The underlying theory of the bill is to substitute for retributive

punishment methods of training and treatment designed to correct and prevent antisocial tendencies. It departs from the mere punitive idea of dealing with criminals and looks primarily to the objective idea of rehabilitation." H.R. Rep. No. 2979; 1950 U.S.Code Cong. Service, pp. 3983, 3985.

Thus, by enactment of the YCA, Congress hoped to provide a better method for treating certain young offenders to be selected by the sentencing judges, and thereby to rehabilitate these offenders. *Dorszynski v. United States,* 418 U.S. 424, 433, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). Rehabilitation is the "underlying theory" of the YCA (H.R.Rep. No. 2979; 1950 U.S.Code Cong. Service, p. 3985). This House committee report, as well as Senate Report No. 1180, 81st Congress, 1st Session, 1949, emphasize the objective of rehabilitation as contrasted with what were perceived as traditional goals in the confinement of non-YCA offenders. They include pointed discussion of the programs of individualized treatment embodied in the English Borstal system, on which the YCA was said to have been modeled.

### C. The merits.

The general and pronounced pattern in the federal correctional scheme is that sentencing judges decide whether an offender is to be imprisoned, but "imprisonment" is left undefined by Congress and by the court's judgment. The word is defined, and the everyday reality of life in confinement is determined administratively by the Bureau of Prisons. The Bureau decides where the offender is to be confined and to what regimen he or she is to be subjected. If changes in the places or the forms of confinement are to occur, either for a particular offender during a particular term or for offenders generally throughout the system, the decisions are to be made by the Bureau.

The YCA represents a sharp departure from this pattern of remarkably wide administrative discretion. The harsh question

---

**3.** Although the YCA has been amended a number of times since 1950, the amendments are not relevant to the issues presented in these cases.

for the court in the present cases is how to respond when it appears that an executive agency is failing to obey a legislative command. Congress has said rather bluntly that offenders aged 18 through 25, sentenced by courts under YCA, are to be segregated from other offenders for purposes of classification and then treatment. The fact appears to be that the Bureau is not segregating them.

When the question is put so baldly, the answer may appear easy. It is not. The reason it is not is that the Bureau has been left to struggle with painful anomalies. The source of these anomalies is that the Congressional departure from the general pattern of administrative discretion is limited to a single group of offenders. The result is that the Bureau is called upon to reconcile a relatively rigid institutional arrangement reflecting a relatively specific correctional theory, imposed by the Congress as to one group of offenders, with a highly flexible institutional arrangement responsive to a variety of correctional theories administratively developed for all other offenders. It is not for me to evaluate the wisdom of either the general pattern of administrative discretion or the YCA departure from the pattern. But some comments on the anomalies arising from their co-existence may illuminate the issue.[4]

A core difficulty lies in assigning a workable meaning to the term "rehabilitation," and thus in prescribing the ingredients of a rehabilitative treatment program.

■ There is no doubt that in enacting the YCA, Congress had in mind some rather specific kind of program. Under the provisions of §§ 5010(b), 5017(c) and 5020, if one is convicted of a crime for which the maximum sentence is two years, for example, and if the sentencing judge chooses to impose sentence under the YCA, one may be confined for as long as six years. The

hoped for rehabilitation obviously comprises "the quid pro quo for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison." *Carter v. United States,* 113 U.S.App.D.C. 123, 306 F.2d 283, 285 (1962). In accord, *Cunningham v. United States,* 256 F.2d 467, 472 (5th Cir. 1958); *Sero v. Oswald,* 351 F.Supp. 522, 526, n. 4 (S.D.N.Y. 1972). Also, under § 5010(d), if the offender is under 22 years of age at the time of conviction, the court must impose a YCA sentence unless the court affirmatively finds that the offender "will not derive benefit from treatment under subsection (b) or (c) . . . ." And under § 4216, if the offender is 22 years of age or older but not yet 26, the court may impose a YCA sentence if it affirmatively finds reasonable grounds to believe that the offender "will benefit from the treatment provided under the [YCA] . . . ." These provisions of the YCA would be inexplicable had not Congress intended the treatment of YCA offenders to differ from what it understood to be the prevailing treatment of non-YCA offenders, young and old.

Yet the term "treatment" which appears throughout the Act, §§ 5010(b), 5010(c), 5010(d), 5010(e), 5011, 5012, 5014, 5015(a), 5020, 5025(a), 5025(b), and 5025(c), is defined no more precisely than "corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders . . . ." § 5006(f). If the Federal Correctional Institution at Oxford housed only YCA offenders, and if the program or programs offered were identical to those now offered to all inmates there, I could not conclude that the Bureau was failing to provide the "treatment" required by the YCA. No doubt, there is a wide array of rehabilitatively oriented treatment programs, all of which would fall within the range permitted by the YCA. I will refer

4. My reservations about the very institution of prisons, and my belief that they lie as a dark continent in federal constitutional law, have been expressed. *Morales v. Schmidt,* 340 F.Supp. 544 (W.D.Wis.1972). But in the present cases, there is no challenge to the federal constitutionality of any particular attribute of confinement, such as censorship, limits on visitations, and so on.

to such programs in this opinion as "YCA-type" treatment programs.[5]

 A second difficulty in dealing with this Congressional intervention with respect to only one segment of the population of federal correctional institutions is related to the first. The legislative history of the YCA suggests that in 1950 Congress viewed the federal correctional institutions as a monolith of retribution in which it was necessary to carve legislatively a niche of rehabilitation for a certain category of young offenders. I doubt that this view was accurate in 1950, but if so, it is no longer accurate. For some time, the theory and practice of corrections have been in a highly volatile state. See, generally, for example, Norval Morris, *The Future of Imprisonment* (University of Chicago Press, 1974); II Corrections Magazine, March 1976, at 3–8, 21–26. Considerable flexibility has developed within the federal correctional institutions—as well as within many state institutions—with varying degrees of emphasis upon retribution, rehabilitation, specific and general deterrence, and simple physical incapacitation, with yet more variety in techniques and methods intended to achieve one or more of these goals. Although controversy persists particularly whether rehabilitation can be coerced during physical confinement, and although the quantity and quality of rehabilitative opportunities available on a voluntary basis leave much to be desired, nevertheless such opportunities in the form of education and counseling and psychiatry, among others, do exist for older as well as younger offenders, for those with much criminal experience as well as for those with little. I have no doubt that there remain in the federal correctional system certain physical facilities and certain treatment programs that would fall clearly outside the permissible range for YCA offenders generally. But the current reality is that YCA-type physical facilities and YCA-type treatment programs are being afforded to many confined offenders who were not sentenced under YCA. It would surely be unreasonable to assume, and so to construe the YCA, that Congress intended to bar from YCA-type treatment programs all offenders not sentenced under the YCA.

 This brings us to a third and related difficulty: that the responsibility for deciding whether certain offenders should participate in YCA-type treatment programs has been divided between sentencing judges and the Bureau.[6] It is true that for those under 22 years at the time of conviction, and for those 22 or older but under 26 years, the responsibility for the initial decision is assigned to the sentencing judges, and that if the sentencing judges decide affirmatively, the Bureau may not disregard, initially at least, the judicial command that the offenders participate in YCA-type treatment programs. But even for those under 22 whom the sentencing judges have decided will not derive benefit from YCA-type treatment programs (§ 5010(d)), the Bureau is not foreclosed from providing the opportunity to participate in such programs. This is more clearly true for those 22 or older but under 26 as to whom the sentencing judges have refrained from affirmative findings that the offenders will benefit from YCA-type treatment programs (§ 4216). It is yet more clearly true of those for whom sentencing judges are powerless to prescribe YCA-type treatment programs, namely, all those 26 or older at time of conviction. During the period of confinement, the Bureau has abundant opportunity to observe from offenders' attitudes and performances whether participation in YCA-type treatment programs is indicated. In any given case, this opportunity for the Bureau persists long after the brief moment at which the sentencing judge makes his or her evaluation. Whether similar or

---

5. The uncertainties concerning the kind of treatment program called for by the YCA are sharply revealed in the several opinions by members of the court in *Harvin v. United States*, 144 U.S.App.D.C. 199, 445 F.2d 675 (1971).

6. This discussion of the comparative roles of the sentencing courts and the Bureau is limited to cases in which there is to be physical confinement. Nor does it reach the matter of the opportunity under the YCA for the setting aside of convictions. § 5021.

divergent standards are used by sentencing judges, on the one hand, and the Bureau, on the other, in discharging the divided responsibility for decision has not been shown and is a question probably not amenable to empirical determination. The same may be said of a comparison of the degrees of care exercised in the judicial and administrative processes. But it is reasonable to suppose that the standards, vague as they no doubt are, are highly similar, and it seems necessary to presume that an adequate degree of care marks both the judicial and the administrative processes.

Thus, absent the enactment of the YCA, it would appear that the following would be a rational arrangement: The Bureau would classify initially all committed offenders 18 years of age or older, and would reexamine their classifications from time to time, in order to identify those for whom YCA-type treatment programs, that is, rehabilitatively oriented programs, should be provided. The Bureau would determine the content of such programs and the physical facilities within which they would be provided, and would make such changes in manner and places of treatment as might appear necessary or desirable from time to time. With respect to the grouping of those deemed eligible for YCA-type treatment, the Bureau would exercise its discretion. If the Bureau considered it sound theory and practice to avoid "herding youth with maturity, the novice with the sophisticate, the impressionable with the hardened," as Congress apparently believed in 1950, the Bureau could develop standards to effect such segregation. However, it is not graven in stone that confinement exclusively with one's peers in age is more effective or desirable than confinement in an institutional community whose membership more closely reflects the age variations encountered outside correctional institutions. If the Bureau considered it sound, it could effect integration among the young and the ma-

ture, the novice and the sophisticate, the impressionable and the hardened, or, more sensibly, it could attempt evaluations of the quality of the maturity, sophistication, and hardness of particular offenders in determining the groups within which they should reside.[7]

Against the background I have described and in view of the specific language of the YCA, there must be decided the central question in this case: how much discretion remains in the Bureau in the cases of offenders committed by sentencing judges under the YCA (to whom I will continue to refer as "YCA offenders")? More particularly, the questions are: (1) whether a YCA offender must be the subject of special classification procedures; and (2) whether, once it has been determined through the classification procedures that he or she is to be physically confined, the YCA offender must be segregated from non-YCA offenders for treatment.

(1) Classification.

 Following the decision by a sentencing judge to commit a young person for treatment under the YCA, the Bureau is called upon by the Act to engage in a special classification process in special classification centers or agencies. This classification study is clearly required to precede a decision by the Director as to the appropriate treatment in a particular case and, therefore, clearly to precede the designation of the particular institution within which the offender is to be confined. § 5015(a). From Memo No. 64 dated January 19, 1954 and Memo No. 62 (supplement no. 1) dated October 4, 1956, it appears that the Bureau shared this understanding in the years closely following upon the enactment of the YCA. The institution at Ashland, Kentucky, was "being converted into a classification center and treatment facility as contemplated by the Act," as was the institu-

---

7. The present record does not reveal the quality of the maturity, sophistication, or hardness of the particular non-YCA offenders who are presently confined with the petitioners at Oxford. Petitioners have presented their cases on the flat contention that no such integration is permissible, without regard to the characteristics of the particular non-YCA offenders with whom they are confined.

tion at Englewood, Colorado, and "most youths between the ages of 18 and 22 will be committed to" one or the other of these institutions, depending upon geography. The administrative history between about 1956 and about 1975 is unrevealed in this record,[8] but it does reveal that there is presently no compliance, save only that there is operative some generalized Bureau decision that one or another of a group of 12 institutions will be designated as the initial place of confinement and the place at which the classification process will occur in the cases of YCA offenders, and that none of another group of 44 institutions will be so designated.

I do not suggest that this record supports a finding that the designation of the place of confinement is not performed YCA case by YCA case, or that it is not performed sensitively and intelligently. But the record does compel a finding that the designation does not involve or await the special classification studies for YCA offenders provided for in § 5014, and apparently intended in 1954 and 1956 to be performed at Ashland and Englewood when they had been converted into "classification centers . . . as contemplated by the Act."

Conceivably the 12 institutions currently designated as the places of confinement for YCA offenders could be viewed as the modern counterparts of the YCA classification centers to which Ashland and Englewood were to be converted. Thus, rather than only two such YCA classification centers, 12 would now be available. But this theory would be vindicated only if it were shown that each of the 12 centers performs a special YCA classification process for the YCA offenders, after which each YCA offender is promptly committed for confinement to that one of the 12 institutions most appropriate in his or her case. It is true

that in policy statement 7300.13E, issued June 16, 1975, on the subject of interinstitutional transfers of all offenders, YCA and otherwise, there is a suggestion that the initial designation is to be viewed as rather tentative—as simply a designation to a "classification center," so to speak, physically located within a particular institution at which the classification process is to be engaged in, followed by a determination as to which one of the 56 institutions would be most appropriate and by a prompt transfer thereto. But no showing has been made in this record that this is how the classification and designation system actually works nationwide or at Oxford, or that there is anything special about how it works in the cases of YCA offenders either nationwide or at Oxford. Rather, it appears that at Oxford, for YCA ofenders and non-YCA offenders alike, the admission and orientation program looks to a decision as to which one of the three functional units at Oxford is appropriate to the case.

It is plain that the classification procedure afforded YCA offenders as a category is not distinct and segregated from that afforded many non-YCA offenders as another category. This lack of discrimination between the two categories was not contemplated by Congress when it enacted the YCA.[9]

(2) Treatment.

Subject only to the qualifying phrase "insofar as practical," Congress has expressly commanded the Director to designate, set aside, and adapt institutions and agencies to be used only for treatment of YCA offenders, and to segregate youth offenders from other offenders. § 5011. From this language it appears that Congress views segregation itself as an essential element of the treatment to be afforded

---

8. Some difficulty has arisen from the apparent absence of a continuing and formalized procedure for the certification by the Director that proper and adequate YCA treatment facilities and personnel are in place. § 5012. See *Robinson v. United States*, 474 F.2d 1085, 1090–1091 (10th Cir. 1973); *United States v. Lowery*, 335 F.Supp. 519 (D.D.C.1971).

9. It should be noted that with respect to classification procedures, as distinct from treatment, the Act contains no saving provision to the effect that there be segregation only insofar as practical.

those offenders committed by sentencing judges under the YCA.

But there is not a single Bureau institution which is used only for the treatment of YCA offenders. Whether there is any institution housing both YCA offenders and non-YCA offenders within which these two categories are segregated is not clear from this record, but it is clear that they are not segregated at Oxford.

Faced with this apparent discrepancy between the statutory command and the actual practice, I understand respondents to argue, first, that despite § 5011 the Bureau enjoys unlimited discretion in deciding the places of confinement and the treatment programs for all offenders, YCA and otherwise; and, second, that in fact, "insofar as practical," institutions and agencies have been designated, set aside, and adapted for use only for treatment of YCA offenders, and YCA offenders are segregated from other offenders.

It is true that 18 U.S.C. § 4082(b) confers broad authority upon the Attorney General to designate "any available, suitable, and appropriate institution or facility" for the confinement of persons committed to his or her custody by sentencing courts and for the transfer of such persons from institution to institution, and that the Attorney General has delegated this authority to the Director. 28 C.F.R. § 0.96(c). Also, § 5015(a) of the YCA itself provides that upon receipt of the report and recommendation from the classification agency the Director may: recommend to the Commission that the offender be conditionally released; transfer the offender to an agency or institution for treatment; or order the offender "confined and afforded treatment under such conditions as he believes best designed for the protection of the public." Section 5011 of the Act provides that treatment shall be undergone "in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment."

I am aware, also, that in *Sonnenberg v. Markley*, 289 F.2d 126 (7th Cir. 1961), it was held that the choice of the place of confinement of a person committed to the custody of the Attorney General under the Juvenile Delinquency Act (18 U.S.C. § 5031 et seq.) lay so wholly within the discretion of the Attorney General that a penitentiary might be chosen. However, at that time the Juvenile Delinquency Act contained no requirement that, following a finding of delinquency, juvenile delinquents were to be confined separately from other persons. In 1974, the Act was amended to require such segregation. 18 U.S.C.A. § 5039 (1976).[10]

 Familiar rules of construction require that the authorization contained in the broad sweep of § 4082(b) be considered limited by the later enacted YCA which was directed to a particular category of offenders. Also, the broad language of §§ 5015(a) and 5011 must be construed within the narrowing and interrelated provisions of YCA which so clearly confine the Director's exercise of discretion as to choice of institutions and choice of treatment.

 I conclude that the Bureau does not enjoy complete discretion in designating the place of confinement of YCA offenders. On the contrary, subject to an important qualification, § 5011 plainly requires that institutions and agencies be designated, set aside, adapted, and used only for the treatment of YCA offenders, and that YCA offenders be segregated from non-YCA offenders.

Therefore, the ultimate question must be answered: whether the Bureau's practice is permissible because the words "insofar as practical" appear in § 5011, which reads:

10. In *Coats v. Markley*, 200 F.Supp. 686 (S.D. Ind.1962), it was held, with heavy reliance upon *Sonnenberg, supra*, that in the choice of the place of confinement of a person sentenced under the YCA, the Attorney General enjoys discretion as complete as that the Attorney General enjoyed under the Juvenile Delinquency Act, as the latter act read when *Sonnenberg* was decided. In *Coats*, the court made no reference to the explicit provisions of the YCA calling for segregated confinement. I consider it necessary to attempt a fresh analysis.

"TREATMENT

"Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director'shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment."

It is not easy to find a construction of § 5011 which gives effect to its arrangement and its punctuation, and also gives common sense effect to "insofar as practical."

One conceivable construction is easy to discard. In this opinion I have discussed at length several anomalies resulting from a Congressional departure, with respect to a certain group of offenders, from the dominant and general pattern of remarkably wide administrative discretion. But it cannot be supposed reasonably that by inserting the words "insofar as practical" in § 5011, Congress intended to permit the Bureau to decide that, by reason of these anomalies or by reason of added costs in facilities and staff, the entire statutory scheme of segregation is impractical and then simply to refrain, wholesale, from implementing the scheme. So to construe the Act would be to infer Congressional willingness that its major command be nullified by the executive. That is, it would be to infer Congressional acquiescence in executive recalcitrance similar to the practice of executive impoundment of Congressionally appropriated funds, a practice so vigorously and recently criticized by Congress. Such a radical construction must yield to a more reasonable view.

The last sentence of § 5011, which opens with "insofar as practical" consists of three clauses: (1) "such institutions and agencies shall be used only for treatment of committed youth offenders," (2) "and such youth offenders shall be segregated from other offenders," (3) "and classes of committed youth offenders shall be segregated according to their needs for treatment." Clause (3) appears to have no bearing on the present cases. Two initial questions concerning clauses (1) and (2) are: whether "insofar as practical" modifies only (1) or both (1) and (2); and whether (1) and (2) can be rescued from redundancy.

I conclude that "insofar as possible" modifies both (1) and (2); there seems no reason to attach this safety valve to the requirement that the institutions and agencies be used only for YCA offenders, but to withhold it from the requirement that YCA offenders be segregated from other offenders.

The apparent redundancy between (1) and (2) is more difficult to solve. If a group of YCA offenders are housed in an institution used only for the treatment of YCA offenders, it follows that they have been segregated from non-YCA offenders. But I am obliged to give meaning to each clause and thus to avoid redundancy, if I reasonably can, and this seems possible. That is, I conclude that if and when it is not practical to house one or more YCA offenders in an institution or agency used only for the treatment of YCA offenders, and the said YCA offender or YCA offenders are housed with non-YCA offenders, then, insofar as practical, the two categories of offenders are to be segregated from one another within the institution or agency 'in which they are both housed. An example might be a training program in a particular skill which the Bureau desires to make available both to YCA offenders and to non-YCA offenders and for which unusually expensive equipment and high salaried instructors are required. Practical considerations, particularly the conservation of funds, might dictate that a single physical facility be maintained for this particular

training program, and that there be brought successively to that facility for the necessary training periods "classes" consisting of some YCA offenders and some non-YCA offenders. While it might be impractical for the two categories to attend segregated classes and laboratories, it might nevertheless be practical to segregate them for all other purposes within the single facility during the training period.

I have undertaken to analyze the last sentence of § 5011. There remains the need to synthesize that last sentence with the two sentences which precede it.

The first sentence reads: "Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment." In this sentence, no mention is made of segregation of YCA offenders from non-YCA offenders, and the references to maximum security institutions and to hospitals, for example, may be thought to imply non-segregation.

The second sentence reads: "The Director shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment." Obviously, this must be read in conjunction with the first sentence, and it seems to imply that from the universe of all the "institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies," then existing or later to come into existence, the Bureau was to designate certain ones, set them aside for YCA offenders, and adapt them for treatment of YCA offenders. Read together, the first two sentences imply at least some degree of segregation of YCA offenders because they would be housed within those institutions and agencies set aside and adapted for their treatment.

Then, of course, the first clause of the third and final sentence makes explicit what was implicit, namely, that those institutions and agencies designated and set aside from the all-encompassing universe of institutions and agencies, and adapted by the Bureau for the treatment of YCA offenders, are to be used only for that purpose, "insofar as practical."

From all this, I can conclude only that Congress has commanded that within a universe consisting of all the institutions and agencies housing all offenders sentenced to confinement by federal courts, there was to be created and there is now to be maintained a smaller universe consisting of those institutions and agencies designated, set aside, and adapted for the treatment of the YCA offenders. And I can conclude only that the institutions and agencies within this smaller universe are to be used exclusively for the treatment of YCA offenders. To speak more concretely, I conclude that the YCA requires that the 2700 or so YCA offenders in confinement (to use the spring 1976 figure) are to be distributed within a segregated network of maximum security, medium security, and minimum security institutions, some of which (presumably the minimum security institutions) would be hospitals, farms, and forestry camps, and some of which (perhaps maximum and medium, as well as minimum security institutions) would be training schools, and some of which (with provision for whatever degree of security may be appropriate) would be yet "other agencies that will provide the essential varieties of treatment."

However, this segregation of YCA offenders within the smaller universe of YCA institutions and agencies need be maintained only "insofar as practical."

It is conceivable that because Congress envisaged a transitional period in the wake of enactment of the YCA, the phrase "insofar as practical" was inserted in part to ease the transition. But it is unlikely that this was the exclusive reason, particularly in light of § 5012, which defers the time at which judges might commence to commit offenders under YCA until the time at

which the Director should certify "that proper and adequate treatment facilities have been provided."

 I conclude that the presence of the phrase "insofar as possible" in § 5011 means that the Bureau is free to depart from the statutory norm of segregation occasionally, in the presence of unusual and unforeseen circumstances, and for only so long as may be necessary. I construe it to mean, also, that the Bureau is free to depart from the statutory norm for longer periods of time, even semi-permanently, with respect to limited numbers of YCA offenders. One example of such an exception might be the need for an unusually expensive and specialized training facility of the sort I have mentioned. Another example might be that if experience reveals that at any given time a number of YCA offenders require confinement under maximum security conditions, but that this number is consistently small (50 to 100, for example), the Bureau would be free to house them in existing maximum security institutions in which non-YCA offenders are also housed; provided, however, that within such maximum security institutions, the YCA offenders are segregated from the other offenders "insofar as practical."

By 1977, of course, any reasonable transition period under YCA is long past. In the present cases there has been no showing that the departures from a scheme of segregation are only occasional, that they are compelled by unusual circumstances, or that they have been brief. Nor has there been a showing that in the particular case of any of these petitioners, the Bureau has concluded, either at the time of the initial designation of a place of confinement or subsequently by reason of his behavior during confinement, that it is necessary that he be specially excepted from a scheme of segregation. On the contrary, the record shows that the Bureau has made non-segregation the continuing norm.

 I conclude that in the case of petitioner Brown, the Youth Corrections Act has been violated by the Bureau's failure, prior to the designation of Oxford as his place of confinement, to perform a separate and distinct classification procedure in the kind of classification center contemplated by the Act. In the case of each of the three petitioners, I conclude that the Youth Corrections Act has been violated, and is being violated, by confinement in an institution not used only for youth offenders committed under the Act and by confinement in which petitioners are unsegregated from offenders not committed under the Act.

### Order

It is ordered that the petition for habeas corpus in each of the above-entitled cases is granted, and that:

1. Petitioner Brown in 75–C–493 is to be released unconditionally on the 91st day following entry of this order unless, prior to that time, he is placed in a center used solely for the classification of offenders committed by sentencing courts pursuant to the Youth Corrections Act; and unless he is thereupon accorded a procedure separately and distinctly designed for the classification of offenders so committed; and unless, if the Director then orders him to be confined, he is then confined in an institution used only for offenders so committed.

2. Petitioner Walls in 75–C–607 is to be released unconditionally on the 91st day following entry of this order unless, prior to that time, he is confined in an institution used only for offenders committed by sentencing courts pursuant to the Youth Corrections Act.

3. Petitioner Weaver in 75–C–544 is to be released unconditionally on the 91st day following entry of this order unless, prior to that time, he is confined in an institution used only for offenders committed by sentencing courts pursuant to the Youth Corrections Act.