Jerry Wayne WATTS, Robert Joseph Allen, Clarence Lloyd Giron, Brien Douglas Wilson, William F. Nicholson, Lee Arthur Sena, Craig Douglas Hassler, Kenneth Erb, Jr., Thomas R. Wilson, Bryan Lee Michaels, and Ricky Campbell, Petitioners,

v.

John T. HADDEN, Warden, Federal Correctional Institute, Englewood, Colorado, Griffin Bell, Attorney General of the United States; Norman Carlson, Director, United States Bureau of Prisons, Audrey Kaslow, Commissioner, U. S. Parole Commission, Respondents.

Civil Action Nos. 78 M 495, 78 M 584, 78 M 618, 78 M 619, 78 M 633, 78 M 669, 78 M 715, 78 M 752, 78 M 889, 78 M 1116 and 79 M 12.

United States District Court,
D. Colorado.

April 20, 1979.

Daniel J. Sears, Federal Public Defender, Denver, Colo., for petitioners.

Jerre W. Dixon, Asst. U. S. Atty., Denver, Colo., for respondents.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

In 1974 the United States Supreme Court made a thorough review of the legislative history and language of the Youth Corrections Act (YCA), 18 U.S.C. § 5005 *et seq.*, and held that because the Congress had so clearly constructed a comprehensive program of rehabilitative treatment and supervision for offenders less than 22 years old, no such person could be given a regular sentence in the absence of an explicit finding by the sentencing judge that the defendant would not benefit from such alternative treatment. *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). These consolidated civil actions are petitions for writs of habeas corpus under 28 U.S.C. § 2241 filed by inmates of the Federal Correctional Institution at Englewood, Colorado. Each of the petitioners has been sentenced under the YCA and each of them contends that he is being held unlawfully because the Bureau of Prisons and the United States Parole Commission have purposefully and systematically failed to follow the requirements of the YCA.

## I. The Statute.

The YCA was enacted in 1950. The legislative history reviewed in *Dorszynski, supra,* reflects the concern that youth is a time of vulnerability, when special factors operate to produce habitual criminals, and that confinement of criminally oriented young people in prisons was actually fostering rather than inhibiting antisocial conduct. See H.R.Rep.No.2979, 81st Cong., 2d Sess., 2–3 (1950), U.S.Code Cong.Serv.1950, p. 3983. To provide an alternative system for young federal law offenders Congress gave judges several options which "represented a departure from traditional sentencing, and focuses primarily on correction and rehabilitation." *Dorszynski, supra* at 433, 94 S.Ct. at 3048. These choices were created to give an opportunity to correct the deficiencies of the individual offender and to return him to the freedom of the community when he has shown sufficient progress that he may be expected to act responsibly. The statute enables the court to consider four different dispositions in the case of a youthful offender.

Upon a finding that there is no need for commitment, the judge may suspend the imposition or execution of sentence and place the defendant on probation with such special terms and conditions as may be indicated. 18 U.S.C. § 5010(a).

Subsection 5010(b) authorizes the court, in lieu of the penalty of imprisonment otherwise provided by law, to sentence the youth offender to the custody of the Attorney General for "treatment and supervision" until discharged by the Parole Commission under the provisions of subsection 5017(c). That subsection requires that the youth offender be released conditionally under supervision not later than four years from the date of his conviction, and discharged unconditionally on or before six years from the date of conviction.

If the sentencing judge finds that the youth offender may not be able to derive maximum benefit from treatment before the expiration of six years from the date of conviction, he may, in lieu of the penalty of imprisonment otherwise provided by law,

sentence the youth offender to the custody of the Attorney General for "treatment and supervision" for any further period that may be authorized by law for the offense of conviction "or until discharged by the Commission as provided in subsection 5017(d) of this chapter." 18 U.S.C. § 5010(c). Under subsection 5017(d) a youth offender committed under subsection 5010(c) must be released conditionally under supervision not later than two years before the expiration of the term imposed by the court and he may be discharged unconditionally at the expiration of not less than one year from the date of conditional release. Unconditional discharge must be granted on or before the expiration of the maximum sentence imposed.

Finally, upon an express finding that the youth offender will not derive benefit from treatment under the YCA, the court may sentence under the penalty provisions applicable to the offense of conviction.

As an aid in making the selection among these options, the court may order the commitment of the offender to the custody of the Attorney General for observation and study "at an appropriate classification center or agency." 18 U.S.C. § 5010(e). The Commission is required to report its findings within sixty days from the date of such order or within such additional period as the court may grant.

"Treatment" is defined in subsection 5006(f):

'treatment' means corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders;

In 18 U.S.C. § 5011 the Congress provided for a variety of institutions and imposed obligations on the Director of the Bureau of Prisons, as follows:

Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director shall from time to time, designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment.

Under 18 U.S.C. § 5012, no youth offender is to be committed until the Director certifies that proper. and adequate treatment facilities and personnel have been provided. 18 U.S.C. § 5013, authorizes the Director to contract with any appropriate public or private agencies for the custody, care, subsistence, education, treatment and training of committed youth offenders. Under 18 U.S.C. § 5014 it is required that each committed youth offender shall be studied at a classification center or agency. The section provides:

The Director shall provide classification centers and agencies. Every committed youth offender shall first be sent to a classification center or agency. The classification center or agency shall make a complete study of each committed youth offender, including a mental and physical examination, to ascertain his personal traits, his capabilities, pertinent circumstances of his school, family life, any previous delinquency or criminal experience, and any mental or physical defect or other factor contributing to his delinquency. In the absence of exceptional circumstances, such study shall be completed within a period of thirty days. The agency shall promptly forward to the Director and to the Commission a report of its findings with respect to the youth offender and its recommendations as to his treatment. As soon as practicable after commitment, the youth offender shall receive a parole interview.

18 U.S.C. § 5015 provides that upon receipt of the report and recommendation from the classification agency, the Director is authorized to make the following choices as to each committed offender:

(1) recommend to the Commission that the committed youth offender be released conditionally under supervision; or

(2) allocate and direct the transfer of the committed youth offender to an agency or institution for treatment; or

(3) order the committed youth offender confined and afforded treatment under such conditions as he believes best designed for the protection of the public.

The Director is also authorized to transfer a committed youth offender from one agency or institution to any other agency or institution at any time. 18 U.S.C. § 5016 requires that the Director "shall cause periodic examinations and reexaminations to be made of all committed youth offenders and shall report to the Commission as to each such offender as the Commission may require."

Subsection 5017(a) provides for the interaction of the Director and the U. S. Parole Commission in determining the release date of a youth offender in this language:

The Commission may at any time after reasonable notice to the Director release conditionally under supervision a committed youth offender in accordance with the provisions of section 4206 of this title. When, in the judgment of the Director, a committed youth offender should be released conditionally under supervision he shall so report and recommend to the Commission.

18 U.S.C. § 5021 provides for the issuance of a certificate setting aside the conviction of a youth offender upon his unconditional discharge before the expiration of the maximum sentence imposed upon him or before the expiration of the maximum period of probation fixed by the court.

As the Supreme Court observed in *Dorszynski, supra,* as to persons committed for treatment under the YCA "the execution of the sentence was to fit the person, not the crime for which he was convicted." 418 U.S. 424, 434, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 853. What treatment is provided is the primary responsibility of the Director who must designate, set aside and adapt institutions and agencies for that purpose and segregate YCA inmates "insofar as practicable." That qualifying phrase was construed in *Brown v. Carlson,* 431 F.Supp. 755 (W.D.Wis.1977) as permitting the occasional departure from the statutory requirement of segregation when unusual and unforeseen circumstances require it with respect to particular inmates or groups of inmates committed under the YCA.

The Congressional emphasis on rehabilitative treatment as the preferred policy for youthful offenders and the individualization of such treatment is reflected in the indeterminate aspect of the confinement under subsection 5010(b). Of critical importance to that concept is the periodic examination, reexamination and reporting requirement of Section 5016. That procedure was obviously established to place emphasis upon the individual inmate's treatment and to require that the determination of the release date "relate to the adjustments and rehabilitation efforts made by [the offender] within the institution." *Snyder v. United States Board of Parole,* 383 F.Supp. 1153, 1157 (D.Colo.1974).

The rehabilitative results which the YCA was designed to achieve have been held sufficiently important to justify the apparent anomaly that a youth offender may lose his liberty for a longer period of time than an adult convicted of the same substantive offense. *United States ex rel. Dancy v. Arnold,* 572 F.2d 107 (3d Cir. 1978).

The first certification of the availability of proper and adequate treatment facilities and personnel for YCA commitments was made in January, 1954 when the Director notified the courts in the First, Second, Third, Fourth, Fifth (except for Texas and Louisiana), Sixth and Seventh Circuits that the Federal Correctional Institution at Ashland, Kentucky was being converted into a classification center and treatment facility as contemplated by the YCA. No certification under 18 U.S.C. § 5012 was given to the courts of the Eighth, Ninth, and Tenth Circuits until October 4, 1956, when the Director advised that the Federal Correctional Institution at Englewood, Colorado was being converted into a classification center and treatment facility.

## II. The Reality of Englewood.

From 1956 to 1976 Englewood was called a Federal Youth Center because it was used primarily for the custody of persons sentenced under the YCA and for Federal Juvenile Delinquency Act cases, although some adult offenders were also housed there. In 1958, young adult offenders between the ages of twenty-two and twenty-six at the time of conviction became eligible for treatment under the YCA in the discretion of the sentencing judge. 18 U.S.C. § 4216. The use of the YCA for young adult offenders had the effect of increasing the average age of the inmates at Englewood. It also required the Bureau of Prisons to designate additional institutions for persons sentenced under the YCA.

The enactment of the Federal Juvenile Justice Act in 1974, 18 U.S.C. §§ 5031–5042, caused the Bureau of Prisons to remove all juveniles from federal institutions because § 5039 prohibits the placement or retention of juveniles in any facility in which adults are incarcerated. In 1976, the Attorney General directed other modifications to identify all of the Bureau of Prisons facilities as Federal Correctional Institutions, Federal Penitentiaries, and Federal Prison Camps. That order changed the name of the Englewood institution to Federal Correctional Institution, Englewood.

The last ten years have brought the burden of overcrowding to federal prisons. The total inmate population increased from 20,000 to 30,000 during that time. The strain of that increase has also affected the Englewood FCI because many adult prisoners were transferred there to alleviate the crowded conditions at other institutions.

Since January 15, 1978 the Western Region of the Bureau of Prisons has utilized a new security designation and classification system for the classification and placement of all inmates, including those sentenced under the YCA. That system is founded on the premise that a person should be housed in an institution which provides the minimum amount of security necessary for him. Accordingly, each institution has been classified according to the level of security maintained there and each individual inmate is rated according to his or her security requirements based upon six specific factors: history of escapes (or attempts at escapes), history of violence, type of detainer, severity of the current offense, expected length of confinement, and type of prior commitment. The inmate has no opportunity to participate in the initial classification decision, but he can be heard when there is a transfer for a disciplinary reason.

The FCI at Englewood has recently been rated as a class three medium level security institution. Only male inmates are housed there and their ages range from 18 to over 50. The average age for YCA inmates is about 20 and the average age for adult commitments is about 28. The sentences being served run through almost the entire spectrum of those which may be imposed under federal criminal statutes. There are no work or study release programs.

In reaction to such court decisions as *Dancy v. Arnold, supra,* and *Brown v. Carlson, supra,* the Bureau of Prisons has recently established a YCA unit at Englewood and some other institutions for the limited purpose of segregating most YCA inmates in a separate residential unit during the hours of night. All of the Englewood inmates share the same arrangements for eating, working, recreation, and participation in educational and vocational training programs. The availability of all educational and vocational training as well as participation in prison industries work is on a voluntary basis within the limitations of the capacity of the staff and facilities. Accordingly, no YCA inmate is required to be in any form of treatment program, except for a 90 day trial period from which the inmate can "opt out" with no adverse consequences.

## III. The Role of the Parole Commission.

The United States Parole Commission was established as an independent agency in the Department of Justice by an Act of Congress in 1976. 18 U.S.C. §§ 4201–4212. The Parole Commission replaced the U. S. Board of Parole. The Commission, com-

posed of nine members appointed by the President, is required under § 4203(a) to promulgate rules and regulations establishing guidelines for the exercise of its power to grant or deny an application or recommendation to parole any eligible prisoner. Under § 4205(a), a prisoner becomes eligible for release on parole after serving one-third of his term, "except to the extent otherwise provided by law." The sentencing judge may alter that eligibility under § 4205(b) by designating a minimum term of less than one-third of the maximum sentence imposed.

Section 4206 provides as follows:

(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare; subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

(b) The Commission shall furnish the eligible prisoner with a written notice of its determination not later than twenty-one days, excluding holidays, after the date of the parole determination proceeding. If parole is denied such notice shall state with particularity the reasons for such denial.

(c) The Commission may grant or deny release on parole notwithstanding the guidelines referred to in subsection (a) of this section if it determines there is good cause for so doing: Provided, That the prisoner is furnished written notice stating with particularity the reasons for its determination, including a summary of the information relied upon.

(d) Any prisoner, serving a sentence of five years or longer, who is not earlier released under this section or any other applicable provision of law, shall be released on parole after having served two-thirds of each consecutive term or terms, or after serving thirty years of each consecutive term or terms of more than forty-five years, including any life term, whichever is earlier: Provided, however, That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State or local crime.

Pursuant to the requirement of § 4203(a)(1), the Commission has promulgated guidelines for a national parole policy and it has issued instructions for the use of those guidelines in the Guideline Application Manual on July 25, 1978. Part III of the manual, entitled "Offense Severity Rating" begins with the following instruction:

In applying the guidelines, the offense severity rating shall reflect the overall circumstances of the present offense behavior. Select the offense rating appropriate to the actual offense behavior that occurred. If the actual offense behavior was more severe than the offense of conviction, the severity rating must be explained on the Notice of Action worksheet (in the space provided) by a brief summary of the specific facts that justify the ratings.

Example: Where the offense of conviction is bank larceny, and the actual offense behavior is bank robbery, the Notice of Action would read: 'Your offense has been rated as very *high* severity because you in fact used a threatening note to rob a savings and loan association.' (Document F—Exhibit T–5)

The "actual offense behavior" may be determined from "information in the file" which may be used if it is "persuasive." To be "persuasive", the information must be specific and corroborated by "established facts." The source of the allegation must "appear to be reliable." The manual expressly authorizes the use of information

contained in a count of an indictment dismissed as a result of a plea agreement. The only explicit exclusion is that "charges for which a prisoner was acquitted after trial should not be used." (Document F in Exhibit T–5) If the offense is not listed among those set out in the guidelines, it is to be rated according to its similarity with those listed. When an offense behavior can be classified in more than one category, the manual directs the use of that which is more severe.

The second component in the computation of the range of time to be served within the guidelines is the "salient factor score." That is an effort to predict the parole prognosis of prisoners according to what the Commission believes are indications of recidivism, called "salient factors." Seven such factors must be considered. Points are deducted for each factor and the lower the score, the longer the time to be spent in confinement.

Item A involves "previous instances of criminal conduct." While 18 U.S.C. § 5021 of the Youth Corrections Act provides for setting aside the conviction of a youth offender, the manual eliminates that benefit in this language:

> g. Setting aside or removal of juvenile or youth convictions (adjudications) is normally for civil purposes (to remove civil penalties and stigma). Such convictions (adjudications) are to be counted for purposes of assessing parole risk. This also applies to adult convictions which were set aside by various methods (including pardons). However, the examiner panel should not count convictions (adjudications) which were set aside or pardoned on grounds of innocence. (Document F—Exhibit T–5)

Item B covers prior incarcerations, including commitments to juvenile institutions and residential treatment centers. Items C concerns the age of the offender at first commitment. A person with no prior commitments is given a score of two if he was 26 years or older at the time of the offense, a score of one if he was 18–25 years old, and a score of zero if he was less than eighteen years of age. Thus, youth is a penalty and a youth offender is, by age alone, given a less positive parole prognosis.

Items D, E and F relate to whether or not the offense of commitment involved auto theft, (or checks), whether or not there was a parole revocation, and whether or not the offender has any history of heroin or opiate dependence. The final item considered in computing the salient factor score is the absence of verified employment or full time school attendance.

The manual also is instructive about reasons for going below the guidelines, which occurs in only about ten percent of all cases. Among the eleven reasons given for a reduced range are such mitigating offense factors as duress or diminished mental capacity. Other factors relate to the parole prognosis, (e. g., the fact that the offender has been free of crime for a substantial time since his last offense). A third category of reasons for reduced confinement includes substantial cooperation by the prisoner in assisting the government in the prosecution of other cases and such substantial medical problems as terminal cancer or a heart condition.

The final reason given for considering decisions below the guidelines is called "exceptional institutional program achievement." In the entire manual issued by the Parole Commission for the application of its guidelines, this is the only statement which could conceivably be considered to relate to the kind of institutional progress and individual response to treatment which are emphasized in the Youth Corrections Act. Yet, the manual makes it clear that this factor should only be considered in the rarest of circumstances by stating:

> . . . The prisoner has made a record of clearly exceptional institutional program achievement over a substantial period of time (_____ months). Note: A clear conduct record and good program achievement is expected. This is a reserved for cases in which the prisoner's record of program achievement is clearly exceptional, and should be supported by the hearing summary. (Document F—Exhibit T–5)

The Parole Commission consistently has used the same offense severity characteristics and the same salient factors to evaluate both YCA inmates and other prisoners, although the range of time to be served under the guidelines is somewhat less for YCA offenders.

It is apparent from the previous discussion that the Parole Commission has refused to accept and implement the fundamental philosophical concept of the YCA. Except in the most unusual circumstances, the inmate's response to rehabilitative treatment is ignored. Because satisfactory institutional conduct is assumed for all offenders, that core concept of the legislative mandate has been cut from parole consideration.

Simply put, the United States Parole Commission has decided that all inmates who come within its jurisdiction should be subject to a determinate sentence. Accordingly, each inmate, early in confinement, is given a presumptive parole date indicating the expected time for release, assuming observance of the rules of the institution. Voluntary participation in educational, vocational and other program opportunities has little effect in determining the time to be spent in confinement.

### IV. The Resulting Violations of Statutory Duties.

 Each of the petitioners received a YCA sentence upon a judicial determination that he would derive benefit from "treatment and supervision". None of them was ever sent to a classification center or agency for a complete study, including a mental and physical examination, to determine his personal traits and capabilities with a written report and recommendations for treatment.

Each of the petitioners was designated for confinement in Englewood as a result of a classification system applicable to all persons within the custody of the Bureau of Prisons. While some of the petitioners have been housed in other federal institutions, none has ever been placed in a facility devoted exclusively to YCA inmates.

While most of the petitioners are now assigned to the recently formed YCA residential unit at Englewood, all of them are mixed into general population with adult offenders for all purposes other than sleeping. Some of the petitioners were given an indeterminate sentence under § 5010(b) and some were given terms under § 5010(c). Each of them has been given a presumptive parole date by the application of the same parole commission guidelines and there is nothing in this record to indicate that institutional adjustment or response to treatment opportunities has been considered in those determinations. The dates were established by the use of hearing examiners in the same procedure which the Parole Commission applies to all prisoners and there is nothing in the evidence to indicate any compliance with the requirement that the Director cause periodic examinations and reexaminations to be made and reported to the Commission or that the Commission has ever required such reports.

The petitioners' participation in educational and vocational training programs is a matter of the voluntary choice of each individual inmate. The size of the educational staff and the number of programs at Englewood have been reduced because of a lowered demand. This may, in part, reflect an increased emphasis on a prison industries program providing earning opportunities for all inmates. The industries program and the educational and vocational training programs at the high school level operate during the same hours and most of the YCA inmates appear to have a preference for the earnings opportunities in industries. In sum, the petitioners are not being confined under conditions which are consistent with the requirements of the YCA.

The record is not clear on the specific parole determinations made concerning the individual petitioners. All of them are subject to the guidelines and those sentenced under § 5010(b) have had their indeterminate sentences transformed into the equivalent of fixed terms of confinement. Neither the Director nor the Commission is complying with the periodic reexamination

and reporting requirements of § 5017. None of the petitioners has the opportunity to obtain an early release by showing response to rehabilitative programs, unless he makes a "clearly exceptional" record of good program achievement.

### V. The Respondents' Rationale.

It is clear from the record in this case and the commendable candor of those speaking for the respondents that the Bureau of Prisons and the United States Parole Commission have purposefully and systematically failed to follow the requirements of the YCA because both of these agencies are in disagreement with that law. The focus of that disagreement is a matter of fundamental philosophy concerning the purpose for confinement of offenders.

The enactment of the YCA resulted from Congress' adoption of the view that antisocial behavior can be corrected in most young miscreants. Those who deviate from the required societal norms have been thought to be subject to being brought into conformity through appropriate treatment in institutions with varying degrees of security and through programs designed to meet the particularized needs of the individual. That approach to corrections has been called the "medical model." There was a time when that view had a predominant position with criminologists and those who had studied the penal system. Such a view was also consistent with a humanistic belief in the importance of environment in forming behavioral patterns.

That view has now fallen from fashion and those in authority in the respondent agencies now reflect a widely held belief that the empirical evidence has disproved the validity of the medical model. Deterrence and retribution are perceived as more important purposes of confinement and it is accepted that there is no known way to rehabilitate a person who does not wish to be rehabilitated.

Consider the following policy statement of the Bureau of Prisons, dated November 22, 1977:

It is an explicit assumption of the Bureau of Prisons that inmates can increase the likelihood of their making a successful return to the free world community through participation in a variety of education/V.T. programs. Further, it is generally accepted that coercion fosters resistance toward, rather than acceptance of, the activity being pressed upon the individual. These considerations have led to the development of an "optional programming" concept as the overriding Bureau of Prisons' program philosophy in the education and vocational training areas. (Document M—Exhibit T–5)

The Bureau of Prisons did an informal feasibility study on the matter of segregation of YCA offenders in the fall of 1977, with a statement of conclusions in a memorandum to the Director dated October 5, 1977 from the Assistant Director of the Correctional Programs Division. The following is a quotation of that memorandum in its entirety:

Last Thursday, you asked that a quick feasibility study be done in order to determine the magnitude of the problems involved in segregating YCA offenders, as recommended in the Solicitor General's memo. The Wardens at Oxford, Petersburg and Morgantown were contacted and the study was proposed to them. A report summarizing their comments is attached.

Two Wardens believe that it is possible, but not practical because of staff problems, costs involved and scheduling. Ken McDannell indicates it is not possible at Morgantown. The segregation of YCA's would result in more restrictions being placed on them and also on the offenders from whom they were being segregated.

I would hope that the extent of the problems involved would be so obvious to the staff in the Solicitor General's office that we would not have to proceed any further with the segregation issue. (Document Mc—Exhibit T–5)

It is not that the Bureau of Prisons is unaware of the requirements of the YCA, it is more a matter of disagreement with the law. In a statement before a House Judici-

ary Subcommittee in Madison, Wisconsin, on October 27, 1978, the Director gave the following succinct statement of his agency's position:

> While the Youth Corrections Act was a landmark at the time of its passage, we believe that experience and changes which have taken place over the years have caused the Act to outlive its usefulness. We support those provisions of the proposed legislation to revise the Federal Criminal Code which would eliminate the Youth Corrections Act. In our opinion sentences for youthful offenders should not be longer than those given older individuals who commit similar offenses. (Document A, page nine—Exhibit T–5)

It is neither necessary nor appropriate to resolve this question of correctional philosophy to determine the issues in this case. It is not a judicial question. It is a political question which must be answered by the political branches of government. All that must be determined here is which of the political branches has controlling authority where there is a direct conflict between the Congress and agencies in the Executive Branch. The answer to that question is rooted in the basic principles of representative government.

It is as much for those who are the elected representatives of the people to determine the parameters of the penal system as it is for them to define what conduct shall be characterized as criminal. In sum, the power to make law is the power of the legislature.

The faithful execution of those laws is the function of the Executive Branch. The Supreme Court of the United States has had recent occasion to remind us of the importance of the proper regard for the respective roles of the three branches of our national government in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978):

> Once Congress, exercising its delegate powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought. *Id.* at 194, 98 S.Ct. at 2301.

In the enactment of the YCA, Congress clearly and unequivocally directed the establishment of a separate system of rehabilitative treatment for youthful offenders and required the consideration of its use by sentencing judges as an alternative to imprisonment. When that judicial discretion has been exercised by a commitment for treatment, it is the plain duty of the Bureau of Prisons to conform to the legislative mandate.

The resistance to the implementation of the YCA by the Bureau of Prisons is not only a matter of philosophy; it is also a question of expense. The internal studies of the Bureau have reached the conclusion that complete separate facilities for all YCA inmates would be all but impossible to achieve without a great increase in cost. There are approximately 2700 YCA inmates in the Federal Prison system and it would require some five or six additional institutions at a cost of millions of dollars to house them separately.

The Bureau also has statistical support for the view that age heterogeneity is a workable violence-reducing strategy in prison institutions. There is a good faith belief that the older inmates are a quieting influence on the youths who tend to be more prone to violence. Additionally, those who are charged with the operation of the prison system believe that there is benefit in assigning young offenders to institutions close to their homes because that enables the continuation of positive support from their families. Finally, the Bureau of Prisons has done a commendable job of making voluntary programs for education and individual improvement available to inmates of all ages. Thus, it is claimed that the treatment concept of the YCA has been expanded to include all inmates. Yet, there is no effort to include those who resist such treatment.

The respondent Parole Commission has sought to justify its policy of transforming indeterminate YCA sentences into determinate sentences through the application of guidelines by the language of the Parole

Commission Act of 1976. While that Act did direct the adoption of guidelines for the release of prisoners, there is nothing in that statute which could be considered to be an implied repeal of the YCA. The only explicit reference to the YCA was the elimination of the Youth Corrections Division of the Parole Board, as previously provided for in 18 U.S.C. § 5005. Accordingly, it must be concluded that the guidelines for use in determining the release of youth offenders must be consistent with the requirements of the YCA. Clearly they are not.

The testimony of the Director of Research for the Parole Commission was that the adoption of guidelines was, in part, a response to public criticism of the lack of articulated standards for the exercise of the parole discretion and the alleviation of disparity in sentencing. While those objectives may be commendable, the guidelines as adopted and applied are retrospective, or historical, in the analysis of the offense behavior and offender characteristics. There is no attempt to consider any response to rehabilitative programs. Essentially, the Parole Commission is redetermining sentences imposed by judges.

The Commission shares the view of the Bureau of Prisons that rehabilitative programs must be voluntary. The Research Director expressed this opinion in testifying that evidence over the past thirty years has demonstrated that coerced program participation, whether explicit or implicit, has not been demonstrated to be effective in promoting rehabilitation. Conversely, it is his view that the uncertainty generated by a lack of explicit standards to determine the release date is dysfunctional for rehabilitative efforts.

Put plainly, the guidelines and the presumptive parole date plan of the Parole Commission amount to telling every inmate, YCA and adult, that "provided that you observe the rules of the institution and bring up an acceptable release plan, this is when you can expect to go home."

I do not doubt that the respondents' failure to follow the law results from the good faith belief that what they are doing is a better approach with more productive results in the public interest. Yet, such good motive is as irrelevant to the consequences of an intentional and purposeful violation of the law by those who have the duty to execute that law as it is to the defense of those charged with criminal violations. The custodians of persons sentenced to confinement must be held to the obligation of obedience to the statute under which persons have been sentenced.

■ A somewhat collateral question has arisen in these proceedings, and because it raises concerns which are of constitutional proportions, it is necessary to comment. The use of information concerning offense severity or behavior characteristics which have not been tested through any adjudicative procedures presents a question of a possible violation of the inmates' procedural due process protection under the Fifth Amendment to the United States Constitution. To provide carefully constructed procedures for reaching the question of guilt or innocence of charged offenses and to ignore such protections with respect to information used for classification as to type of confinement, place of confinement, and duration of confinement is incongruous. As I understand this record, the most cautiously constructed plea agreement can be circumvented by the simple expedient of giving the Parole Commission information which it considers credible. Providing the inmate with a summary of that information but without an adequate opportunity to challenge its accuracy is scant protection and it is difficult to see how an inmate so affected can be convinced of the fairness of the system which controls his liberty.

## VI. Remedy.

■ These petitions were filed to seek writs of habeas corpus under 28 U.S.C. § 2241(c)(3). Under § 2243, upon determination of the facts, the court is obliged to "dispose of the matter as law and justice require." Ordinarily, if it is determined that the petitioner is in "custody in violation of the Constitution or laws or treaties of the United States" the required relief is a discharge or release from that custody.

The inescapable conclusion from the record in these cases is that each of the petitioners is being held in custody in violation of the mandatory requirements of the YCA. Yet, the immediate and unconditional release of these inmates does not seem to be an appropriate remedy at this time. Each petitioner has been lawfully convicted and sentenced to a term of confinement and some of them are guilty of very serious offenses. While it is now apparent that the judges who imposed these sentences had an expectancy that there would be benefits from correctional treatment, and while it has been demonstrated that such an expectancy has not been realized, that result does not dictate a reversal of the determinations that confinement is necessary.

The violations of the YCA which have been proven in this case can and should be corrected by remedial action which will have an effect beyond the circumstances of confinement of these individual inmates. It is significant to me that the respondents here have essentially ignored or disregarded prior court decisions interpreting the requirements of the YCA. There is an incredible irony in reading the Supreme Court's careful articulation of the policy, purposes and procedure of the YCA in the direction given to sentencing judges in *Dorszynski, supra,* with the knowledge that the entire system therein described simply does not exist. What are the continuing effects of this deliberate disregard of the YCA?

For those judges who have become aware of the reality of the youth corrections system in this country, it is an act of hypocrisy to use this sentencing alternative upon a finding that the defendant would benefit from "treatment and supervision". For those judges who may not be aware of what actually happens to a defendant sentenced under the YCA, the continued use of this alternative is a true act of "blind justice."

The power of the courts to fashion appropriate relief other than immediate release under habeas corpus was made clear by the Supreme Court in *Peyton v. Rowe,* 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968). The expansion of the jurisdiction provided under 28 U.S.C. § 2241(c)(3) to redress unconstitutional or unlawful conditions of confinement under valid sentences has been well summarized in *Developments In The Law-Federal Habeas Corpus,* 83 Harv.L. Rev. 1038 (1970).

This court has jurisdiction to compel obedience to a clear and unequivocal directive under the mandamus provisions of 28 U.S.C. § 1361. In the exercise of that jurisdiction, courts must be careful to distinguish between agency action taken within a range of delegated discretionary authority and clearly defined ministerial duties. *See, Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); *Holmes v. U. S. Board of Parole,* 541 F.2d 1243 (7th Cir. 1976). In these cases under the YCA, the respondents have both such duties and discretion. The establishment of the systemic structure of classification centers or agencies, segregated institutions, examination and reexamination, treatment according to individual needs and those other matters discussed in Part I of this opinion are duties which may be enforced by mandamus. The manner in which individual inmates are to be classified and provided treatment is discretionary with the respondents. *Dancy v. Arnold, supra.*

Because there can be no clear delineation between duty and discretion here, this court cannot structure an order of conditional release in these cases. Thus, I am unable to direct any specific requirements for the respondents to meet as conditions of confinement for these individual petitioners with provisions for release if such conditions are not performed. This is a circumstance not unlike the role of the courts in the desegregation of school systems where those in authority have violated constitutional criteria of equality. In those cases, it has become commonplace to call for a plan of operations within a reasonable period of time. I choose to follow that approach here.

I recognize that the corrective actions necessary to comply with the views expressed in this opinion will be disruptive. I know too that there may be significant costs of compliance. It is that consequence which has previously been used to excuse the failure to follow the YCA under the pretext that the duty to segregate is limited by the "insofar as practical" language in § 5011. As clearly held in *Dancy v. Arnold, supra,* and *Brown v. Carlson, supra,* that is not a correct interpretation of the YCA in the light of the legislative history.

If it is true that the Bureau of Prisons is unable to meet the mandate of the YCA because of inadequate funding, it then becomes the duty of the Director to go before the Congress to ask that it deal with his dilemma by providing adequate funding or by repealing the YCA. While the choice is the constitutional prerogative of the Congress, the presentment of the problem calling for the exercise of that political judgment is the responsibility of the respondents.

The record before me is inadequate to make an informed judgment about the effects of the Parole Commission's guidelines and procedures on the interests of the individual petitioners. It should not be required that each of them must carry the burden of persuasion that he has been denied a statutory entitlement or that there has been an infringement of a constitutionally protected right in the determination of his release date. Given the Commission's view of its authority, it is more appropriate to require that it come forward with an explanation of the action which has been taken and the reasons for that action, including what information, if any, and what sources of information, if any, were relied upon in addition to the court records, presentence investigation reports, and communications from the sentencing judge.

I have said that the immediate release of the petitioning inmates is inappropriate in these cases and that the granting of writs of habeas corpus upon specific conditions would not now be ordered. That should not be misunderstood. If the following orders are not obeyed, I intend to take such action as may be necessary to enforce the law, including the granting of writs of habeas corpus and the exercise of judicial powers appropriate to a refusal to obey an order of court.

Upon the foregoing, it is now

ORDERED that the respondents, Griffin Bell, Norman Carlson, and John T. Hadden, shall on or before September 1, 1979 submit a written plan for the implementation of the Youth Corrections Act as interpreted in Part I of this Memorandum Opinion as it applies to the petitioners herein, and it is

FURTHER ORDERED that Parole Commissioner Audrey Kaslow shall within thirty days from this date file with this court a written statement setting forth the release date which has been determined for each of the petitioners herein; an explanation of the procedure by which that release was determined; a statement of the manner in which the appropriate guidelines were applied in reaching that determination; and a statement setting forth what, if any, information not contained in the presentence report or in communications from the sentencing judge was used in arriving at that decision, together with an identification of the source of such information; a statement of what reexamination of each petitioner is to be made, when it is to be made; and, what, if any, recommendations have been received from the Director with respect to each of the petitioners.