Bradley James JOHNSON, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Griffin BELL, Attorney General, United States Department of Justice, et al., Defendants.

Civ. A. No. 8–71747.

United States District Court, E. D. Michigan, S. D.

March 12, 1980.

Martin A. Geer, Wayne State University Law School, Clinical Program, Detroit, Mich., for plaintiffs.

L. Michael Wicks, Ellen Ritteman, Asst. U. S. Attys., Detroit, Mich., for defendants.

MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

This is a class action on behalf of approximately 200 inmates at the Federal Correctional Institution at Milan, Michigan, who were sentenced to custodial terms under the Youth Corrections Act, 18 U.S.C. § 5005 *et seq.* The defendants consist of the Attorney General of the United States, the Director of the Federal Bureau of Prisons and the Warden at Milan. While not named as a party, the United States Parole Commission participated in the proceedings with Department of Justice representation. It is assumed that the parties concede that the Commission is a proper party and if necessary can be formally added. Rules 19 and 21, F.R.C.P. The matter was referred to the Magistrate for report and recommendation. Several suits brought by individual inmates seeking habeas corpus relief on the same grounds as asserted in the class action suit were consolidated with the latter. The Magistrate conducted a hearing that resulted in approximately 1,000 pages of transcribed testimony and over 65 exhibits and filed his Report and Recommendation. Objections to that Report were submitted by the plaintiffs and defendants and the Court has, therefore, reviewed the entire record *de novo.*

The issues, which will be delineated and discussed below, revolve around the claims of the plaintiffs that certain constitutional and statutory rights have been violated by the alleged failures of the defendants in their implementation of the Youth Corrections Act (hereinafter YCA).

The YCA was enacted in 1950 and was a new, supposedly enlightened approach to the sentencing and treatment of young offenders. The legislative history of the YCA, its purpose and promise have been discussed extensively in several reported cases and to reiterate here would not serve a useful purpose. *See Dorszynski v. U. S.,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *Durst v. U. S.,* 434 U.S. 542, 98 S.Ct. 849, 55 L.Ed.2d 14 (1978); *U.S. v. Hopkins,* 531 F.2d 576 (D.C.Cir. 1976). Suffice it to say, the YCA recognized the susceptibility

of youth and the perceived need for more effective methods of correctional treatment. It was a studied and comprehensive attempt to provide new concepts of treatment of youthful offenders. This was sought to be accomplished in several ways: by offering the judge novel alternatives as to the sentences, and when custodial sentences were imposed, by requiring methods of classification, segregation and instruction significantly different than those traditionally applied. While not faced with the specific issues in the case at bar, the exegesis of the Supreme Court on the YCA is most instructive, and, of course, authoritative. Thus, in *Dorszynski, supra,* 418 U.S. 433, 434, 94 S.Ct. 3048, the Court, in describing the operation of the YCA, said:

"The objective of these options represented a departure from traditional sentencing, and focused primarily on correction and rehabilitation. All persons under 22 years of age at the time of conviction were made eligible for probation or treatment under the Act, the latter defined as 'corrective and preventive guidance and training designed to protect the public by correcting [their] antisocial tendencies.' 18 U.S.C. §§ 5006(e) and (g). To implement the program of treatment for youth offenders committed under the Act, a Youth Correction Division was created under the Board of Parole which, in conjunction with the Bureau of Prisons and the Probation Service, operates to provide the unique features of the Act's program. 18 U.S.C. § 5005.

"An important element of the program was that once a person was committed for treatment under the Act, the execution of sentence was to fit the person, not the crime for which he was convicted. Classification agencies were to be established by the Director of the Bureau of Prisons to receive and study the person committed and make recommendations to the Director as to appropriate treatment. 18 U.S.C. §§ 5014, 5015. Further, the range of treatment available was made broad to provide maximum flexibility. The Director was authorized both to

adapt numerous public facilities, and to contract with public or private agencies, in order to provide institutional treatment which the Director could vary according to the committed person's progress or lack of it. 18 U.S.C. §§ 5011, 5015. An integral part of the treatment program was the segregation of the committed persons insofar as practicable, so as to place them with those similarly committed, to avoid the influence of association with the more hardened inmates serving traditional criminal sentences. 18 U.S.C. § 5011."

Apparently the Bureau of Prisons embraced wholeheartedly the YCA concepts at the outset (see statement of James V. Bennett, Director of the Bureau of Prisons, Correctional System for Youth Offenders: Hearings Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st Sess., 27 (1949)) and by January, 1954 the Director notified the Courts in seven Circuits that the facility at Ashland, Kentucky, was being converted into a classification center and treatment facility. In 1956, the facility at Englewood, Colorado, was certified for the remaining circuits. This record does not establish what occurred during the next twenty years, but the inference is obvious that the implementation of the post-sentence provisions of the YCA took a direction that at the very least appears to be contrary to the literal language of the Act. By 1976, Chief Judge Bazelon, writing in *U. S. v. Hopkins, supra* at 585, would say:

"Although courts in the District repeatedly have criticized the way in which the Act has been implemented, improvement has not been forthcoming.

"We must remain vigilant in exposing, rather than concealing, these problems. Should we not, the charade of compliance with the Act will be perpetuated."

Then in 1977, the case of *Brown v. Carlson*, 431 F.Supp. 755 (E.D.Wis.) afforded the first real opportunity for a thorough and detailed inquiry and analysis of the way in which the YCA was considered and applied by the defendants. This was followed by *Watts v. Hadden*, in the District of Colorado, 469 F.Supp. 223 (1979) in which Judge Matsch conducted a comprehensive examination of Bureau of Prisons and Parole Commission policies and operations of YCA offenders. A comparison of the evidence adduced in the case at bar with the judicial findings of the *Brown* and *Watts* courts reveals, not surprisingly, substantially identical factual situations. (Much of the record in *Watts* was incorporated in this record by stipulation.) It is patent that we are dealing with a systemic problem and that the variations among federal correctional institutions in different districts in the treatment of YCA offenders are minimal, the overall programs affected only slightly by local conditions. This Court agrees substantially with the findings of the *Brown* and *Watts* opinions.[1] While this should undoubtedly dictate the utilization of the virtue of brevity by this Court, the importance of the issues; the differences, albeit slight, in local conditions; the augmented arguments of the defendants and the need to maintain a context require substantial discussion.

## A. CLASSIFICATION AND PLACEMENT OF YCA OFFENDERS

When a young offender is committed pursuant to the YCA, it is required that he first be sent to a classification center or agency for a complete study, including a mental and physical examination, to ascertain personal traits, capabilities and features of his background and character. The report of the findings and recommendations as to treatment are to be submitted to the Director of the Bureau of Prisons and the Parole Commission. (18 U.S.C. § 5014.) The Director may then recommend to the

---

1. In addition the Court finds that the plaintiffs' Requests for Findings of Fact in the case at bar offer an extensive and well documented set of specific findings. While the Court does not agree with all of the findings, it does consider them fair and reasonable in presenting an accurate panorama of the current institutional program. Moreover, the defendants do not take issue with the specific findings of fact; rather the critical issues are the interpretations of certain provisions of the YCA and their compliance with the purpose and spirit of the YCA.

Parole Commission an immediate conditional release; may transfer him to an institution or agency; or may confine him and afford treatment under conditions the Director believes best designed for the protection of the public. The Director is also given broad transfer power. (18 U.S.C. § 5015.) Classification is a critical stage of the commitment and treatment process since it provides the initial basis for placement and treatment and implements the concern of Congress for individualized treatment limited only by the requirements of public safety. Thus, 18 U.S.C. § 5011, provides that a committed youth offender shall undergo treatment in an institution of maximum security or minimum security, including training schools, hospitals, farms, forestry and other camps that will provide essential varieties of treatment.

It is undisputed that there are no separate or specially designated classification centers. The current and apparently long-standing policy[2] is that upon the entry of a custodial commitment order the appropriate Regional Director's office (Bureau of Prisons) designates the place of confinement after a review of the information it may obtain, primarily from a presentence report and the judge's recommendation. The major factors in determining initial placement are pointed not at the offender's characteristics but at the character of the institution and apply not to youth offenders specifically but to all offenders. Thus, the Bureau has classified its institutions under three norms: general age of the inmate population, criminal sophistication level of the inmates and geographical location. An offender profile based on those elements determines where the offender is committed and placement is usually accomplished within 72 hours.

Upon entry into the designated institution, the inmate is assigned to a housing unit, given various tests and examinations and interviewed by staff and counsellors. A plan is then formulated to provide for the inmate's curriculum while incarcerated. That plan, however, is restricted by the facilities and programs available at the already designated institution. This classification process does not distinguish between YCA inmates and adult inmates.

It is the position of the defendants that the YCA does not mandate separate classification centers and that since each institution provides a classification process regulated by Bureau regulations and uniform standards, the letter and spirit of the YCA are being followed. It is argued by the Bureau that the system utilized insures that an inmate is initially directed to an institution presumptively appropriate for him and that the classification procedure there determines if the institution is in fact appropriate and what programs are best for him.

■ It appears to this Court that the Congress did contemplate that the classification process was to be distinct and separate. Otherwise Congress would not have chosen such words as "classification centers and agencies"; require that the offender "shall *first* be sent to a classification center; that the center or agency shall make a complete study; that the Director would designate a place of confinement *on receipt* of the report from the classification agency. 18 U.S.C. §§ 5014 and 5015. This does not mean to say that the Bureau was precluded from utilizing existing institutions and facilities, but obviously the Congress had in mind the forming and development of specialized units that would provide a more expert and thorough classification procedure than was then available or has since been established. Contrary to that clear mandate, the current classification group consists of the custodial and counselling staff of the institution. There is apparently no training as to classification methods nor even as to the recognition and identification of problems and the consequent needs of YCA offenders. Out of approximately 250 new commitments per year at Milan less than a handful are transferred to

---

2. The use of the Ashland and Englewood FCI's noted *supra*, as designated classification centers was discontinued at some unknown date.

another institution because of individual program requirements.

The defendants contend that the identical classification procedure and staff is utilized as to all offenders because it has determined that "the same factors would benefit YCA and non-YCA offenders alike" (Defendants' Trial Brief, p. 3). These factors are given as "age, degree of criminal sophistication, sentence, and nearness to home", ibid. The Court has great difficulty in squaring that contention and those factors with the explicit language of the statute. 18 U.S.C. § 5014 provides:

" . . . The classification center . . shall make a complete study of each . . youth offender, including a mental and physical examination, to ascertain his personal traits, his capabilities, pertinent circumstances of his school, family life, any previous delinquency or criminal experience, and any mental or physical defect or other factor contributing to his delinquency."

In further justification of its policy the Bureau contends that its process "transcends the rigid concept of an initial classification only approach" because during the three day admission and orientation program at Milan, " . . . (the) variety of programs at Milan are explained to him, and the inmate is able to select his programs depending on what he wishes to accomplish during his stay. The classification process serves two major goals; first it is determined if Milan is an appropriate institution for the inmate; second it is determined what programs are best for him." (Page 2, Defendants' Post-Trial Memorandum of Law.) That rationale is completely unconvincing.

In the first instance, the appropriateness of the institution has already been determined by the Regional Director on the basis of the age, sophistication and nearness to home factors. Secondly, it is evident that the inmate must fit himself into the "variety of programs available at that institution" and no effort is made to provide programs that fit the needs of an inmate nor to transfer him to an institution that may have such programs. Nor can this be done, for, lacking the type of deep and thorough analysis of the inmate's characteristics required by the YCA, it is not possible to determine the needs of that inmate.

What emerges, then, as a realistic matter, is that the Bureau has classified its institutions, determined what facilities and programs that institution should have and feeds its YCA offenders into the institution that is nearest to his home, the latter factor being conditioned only by the added considerations of his age and criminal sophistication level, i. e., the security classification of the institution. The end result is that the *individual* consideration mandated by Congress in YCA, cases has been entirely subverted and in its place, the Bureau has substituted a system of generalized, forced and uninformed classification and placement.

## SEGREGATION OF YOUTH OFFENDERS

The YCA, provides in pertinent part that: "Insofar as practical, such institutions and agencies (designated for treatment of committed youth offenders) shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment." (18 U.S.C. § 5011).

It is conceded by the defendants that there have been no attempts to designate specific institutions as youthful offender facilities and only aborted attempts at segregating YCA offenders from adult offenders. As a matter of fact, it has only been within the last two years or less that there was any policy which segregated the sleeping quarters of adult and YCA offenders.[3]

At Milan, sleeping quarter segregation is the only YCA-adult offender segregation in force. At all other times, working, eating,

---

**3.** Sleeping quarter segregation was undoubtedly prompted by the *Brown* case, *supra*,—a sort of token effort to comply or a compromise by the Bureau.

training, schooling and recreation, there is no attempt to separate YCA from adult offenders.

The major response of the defendants to the failure to provide separate YCA institutions or to segregate within institutions is that under the above-quoted provision the Bureau is given absolute discretion to determine whether there should be *any* segregation. This contention is based on the prefatory language: "Insofar as practical".

The foregoing phrase was carefully analyzed by Judge Doyle in *Brown, supra* at pgs. 770–773, and this Court has no reason to dissent therefrom. On the contrary this Court is in complete accord with his reasoning and conclusion and adopts it herein. To assist in cohesiveness, the following excerpts are included herein:

"From all this, I can conclude only that Congress has commanded that within a universe consisting of all the institutions and agencies housing all offenders sentenced to confinement by federal courts, there was to be created and there is now to be maintained a smaller universe consisting of those institutions and agencies designated, set aside, and adapted for the treatment of the YCA offenders. And I can conclude only that the institutions and agencies within this smaller universe are to be used exclusively for the treatment of YCA offenders. To speak more concretely, I conclude that the YCA requires that the 2700 or so YCA offenders in confinement (to use the spring 1976 figure) are to be distributed within a segregated network of maximum security, medium security, and minimum security institutions, some of which (presumably the minimum security institutions) would be hospitals, farms, and forestry camps, and some of which (perhaps maximum and medium, as well as minimum security institutions) would be training schools, and some of which (with provision for whatever degree of security may be appropriate) would be yet 'other agencies that will provide the essential varieties of treatment.'

"However, this segregation of YCA offenders within the smaller universe of YCA institutions and agencies need be maintained only 'insofar as practical.'

"It is conceivable that because Congress envisaged a transitional period in the wake of enactment of the YCA, the phrase 'insofar as practical' was inserted in part to ease the transition. But it is unlikely that this was the exclusive reason, particularly in light of § 5012, which defers the time at which judges might commence to commit offenders under YCA until the time at which the Director should certify 'that proper and adequate treatment facilities have been provided.'

"I conclude that the presence of the phrase 'insofar as possible' in § 5011 means that the Bureau is free to depart from the statutory norm of segregation occasionally, in the presence of unusual and unforeseen circumstances, and for only so long as may be necessary. I construe it to mean, also that the Bureau is free to depart from the statutory norm for longer periods of time, even semipermanently with respect to limited numbers of YCA offenders. One example of such an exception might be the need for an unusually expensive and specialized training facility of the sort I have mentioned. Another example might be that if experience reveals that at any given time a number of YCA offenders require confinement under maximum security conditions, but that this number is consistently small (50 to 100, for example), the Bureau would be free to house them in existing maximum security institutions in which non-YCA offenders are also housed; provided, however, that within such maximum security institutions, the YCA offenders are segregated from the other offenders 'insofar as practical.'

"By 1977, of course, any reasonable transition period under YCA is long past. In the present cases there has been no showing that the departures from a scheme of segregation are only occasional, that they are compelled by unusual circumstances, or that they have been brief. Nor has there been a showing that

in the particular case of any of these petitioners, the Bureau has concluded, either at the time of the initial designation of a place of confinement or subsequently by reason of his behavior during confinement, that it is necessary that he be specially excepted from a scheme of segregation. On the contrary, the record shows that the Bureau has made non-segregation the continuing norm."

Although the foregoing would seem to be dispositive of the issue, some further discussion with regard to certain prevailing features and to additional arguments of the defendants may be helpful in understanding the factual situation and also in understanding the prevailing attitude and philosophy of the defendants vis-a-vis the YCA.

The defendants contend that even if the Court were to adopt the "strict segregation" requirement of *Dancy v. Arnold*, 572 F.2d 107 (3rd Cir. 1978), *Brown, supra,* and *Watts, supra,* the Milan institution is still in compliance under the "insofar as practical" phrase. Thus, the Bureau contends that *internal* segregation would

1. Result in a loss of freedom of movement;

2. Require inordinate amounts of staff and guard time policing movements of segregated groups;

3. Result in the loss or cut-back in programs now available to both YCA and adult offenders;

4. Result in an adverse impact on maintenance and work functions;

5. Result in shorter visiting hours;

6. Threaten the viability of the Federal Prison Industries program; and

7. Involve the additional "mortification" of labeling each inmate as to his "sentence structure".

As to external or separate facility segregation, the Bureau contends that it would frustrate the overriding Congressional intent to provide rehabilitative treatment for youth offenders by:

a. Overriding a fundamental tenet of effective correctional treatment, to wit: to house the offender near his residence in order to foster family communication, visiting and involvement in programs in the home area to which the offender will be eventually released. This is so, it is argued, because only five institutions would be needed for YCA offenders and these would be scattered throughout the country.

b. Dictating by virtue of budget considerations that youth offenders of various custody classifications, i. e., highly sophisticated to unsophisticated, be mixed due to the potentially small number of YCA institutions.

It is, of course, tempting to anyone concerned with the sentencing process, and perforce, the result of it, to respond to the arguments delineated above each by each.[4] To do so, however, would entail the imposition of that person's philosophy and attitudes regarding sentencing and the penal system and its possible departure from or agreement with those of the defendants. This is so because it must be obvious that the arguments of the defendants do not really deal with how much is practical and how much is impractical; rather it is their argument that not only is it wholly impractical to segregate to any degree but also such segregation is contrary to their perception of effective correctional tenets.

The critical point in this compendium of arguments is that Congress in the Youth Corrections Act has already decided what constitutes an effective correctional program with respect to those sentenced under the Act. Congress determined that YCA offenders should be segregated, if not in a

---

4. For example, the argument that YCA inmates should be housed in any institution to facilitate involvement in programs in the home area to which the offender will eventually return is hardly convincing. Milan does not now provide work or study release programs. The system utilized is the transfer to a half-way house or agency in the home area shortly before release. The confinement institution appears to play no role whatsoever regarding "involvement in programs in the home area".

separate institution, at least, within an institution which may also contain adult offenders. It is difficult to assume that the Congress, after conducting extensive hearings including strong advocacy of the YCA by Bureau of Prison officials, did not realize that separate institutions or internally segregated units would not involve logistical, budgetary and other similar problems.[5] On the contrary, it must be assumed that Congress was aware of these potential problems but in its studied attempt to provide a new approach to the treatment of youthful offenders determined they could be resolved. This is evident from the very phrase "insofar as practical" for that implies that practical considerations would require some restrictions and limitations. It is a far cry, however, from the argument advanced by the defendants that the phrase should be construed as "if it is practical, segregate; if it is not practical, do not segregate."

### TREATMENT FACILITIES AND PROGRAMS

Section 5006(g) of the Act (18 U.S.C. § 5006) provides as follows:

" 'Treatment' means corrective and preventative guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders."

The Court readily recognizes that the definition of "treatment" [6] is all-encompassing and is undoubtedly one that can and should be applied to all offenders regardless of age. It is, therefore, necessary to consider the term as it is further embellished contextually in other provisions of the Act.

■ It is apparent that as to what should constitute "treatment" is left almost wholly to the discretion of the defendants. The discretion is not unfettered, however, for it is obvious that the underlying purpose of the YCA was to provide a "specialized treatment", otherwise there would have been no reason for the YCA in the first instance. As was said in *U. S. v. Lowery*, 484 F.2d 457, 458 (3rd Cir. 1973):

"Despite this affirmance, we are seriously troubled by appellant's allegation that he is not receiving treatment as a youth offender as required by 18 U.S.C. § 5011. If this is true, and if the circumstances of appellant's confinement are no different than those of adult offenders, then we have no doubt that some kind of relief is appropriate. As Mr. Chief Justice Burger has stated, 'the basic theory of [the Youth Correction Act] is rehabilitative and in a sense this rehabilitation may be regarded as comprising the *quid pro quo* for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison.' Consequently, we remand this case and order that a hearing be held to determine whether appellant is receiving treatment as mandated by 18 U.S.C. § 5011." (Citations omitted.)

This issue is perhaps the most perplexing and difficult of analysis and resolution of those presented in this case, particularly because it is so easy to become embroiled in the propositions, analyses and opinions of experts and laymen as to the appropriateness and effectiveness of penal programs, facilities, environments, counselling, training and the myriad elements that are generally considered in the devising of a successful penal system. This involves not only subjective judgments of the effectiveness of a given program such as work release or vocational training or a prison industry, but entails concepts regarding the raison d'etre of a penal system and its success, or lack thereof, in rehabilitation, reducing recidivism, protecting society and other much sought after goals.

■ As a result, the Court is reluctant to enter into a discussion as to individual programs provided or not provided at Milan at the present time. One of the reasons that this course is chosen is that regardless of

---

**5.** It is also difficult to conceive that Bureau officials themselves did not realize the possibility if not probability of these same problems and advise the Congress accordingly.

**6.** The defendants prefer and utilize the term "programming" because of the "negative connotations surrounding the term".

the merit of such programs it is apparent that the "treatment" afforded YCA offenders at Milan in the broad sense is not that treatment required by the Act itself.

As may be gleaned from *Lowery, supra,* "treatment" involves the circumstances of confinement, and if those circumstances of confinement are no different than those of adult offenders, then some relief must be granted. In context, then, treatment involves not only the availability of specific prison programs but also the circumstances of confinement and that term must necessarily include such elements as segregation, the availability of a *variety* of programs to which assignment can be made in accordance with the particular needs of an individual inmate as determined by a thorough classification study, and to repeat Chief Justice Burger's statement ". . . (different) conditions and terms than a defendant would undergo in an ordinary prison."

Viewed in that perspective and bearing in mind the previous discussion regarding classification and segregation, it is apparent that YCA offenders are currently experiencing the same conditions they would undergo in an ordinary prison and if sentenced as adults. As a matter of fact, a YCA offender may be placed in a less favorable environment than that afforded adults as is evidenced by the testimony that at Milan YCA inmates are housed in two open dormitory units whereas adult offenders are provided separate cells. The defendants respond to the latter by the rather fatuous argument that, granted a separate cell is preferable, "most people would prefer to drive an El Dorado as opposed to an economy car." It is not, of course, a matter of the preference of an individual inmate but rather whether separate housing is more conducive to the rehabilitation of a YCA offender and whether it would serve to satisfy the requirement of specialized treatment and avoid the environment of the "ordinary prison" so inimical to the purposes of the YCA.

█ This concept of the "ordinary prison" is not, of course, arbitrary nor idle. It must be taken as significant, for example, that the Congress in the Treatment Section (5011) stated that the committed youth offender "*shall* undergo treatment in institutions . . ., including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the *essential varieties* of treatment." (Emphasis supplied.) The interpretation that must be placed on that language is that the Congress was signaling that "ordinary prisons" were inappropriate or at the very least should be considered only as a possible resort in the event of security considerations. As far as this record discloses, there has been no attempt to find and develop such treatment resources and, more critically, no attempt to alter the monolithic prison model.

The defendants also argue that the fact that identical programs are provided for both YCA and adult offenders does not mean that the programs are inappropriate for YCA inmates. The thread of this argument winds itself throughout the defendants' position with regard to all the issues here involved; that is, that the fact that YCA inmates are classified, mixed and treated just as are the adult offenders does not signify that the YCA's provisions and purposes are not being fulfilled. That, of course, stands the matter on its head. No one is suggesting that there should be a difference merely for the sake of difference. The point is that Congress specifically determined what the differences are to be and imposed them as a mandate. An additional example may be illuminating. Upon entering the institution, an inmate is informed of the available programs and "the inmate is able to select his programs depending on what he wishes to accomplish during his stay." (Pg. 2, Defendants' Post Trial Brief.) It is perhaps not surprising, especially in view of the "variety" of programs available that a not insignificant number choose a program such as Prison Industries because they are able to earn some money. In this Court's view that does not satisfy the requirements of the YCA which contemplate not only the initial classification study but also the specialized and

---

individualized treatment that should be afforded a YCA.[7] The overall impression must be that *all* inmates are informed of available programs (and, at the same time, of the rules of the prison and other housekeeping details) and then left to their own devices (the term is used advisedly). While that may be appropriate and innocuous insofar as adults are concerned, it does not comport with the concerns and, to Congress, the potential value of specialized YCA treatment.

## DISCUSSION OF BUREAU OF PRISON PRACTICES AND POLICIES

[6] It is readily apparent from the foregoing analysis that the Bureau of Prisons has abandoned the underlying spirit and corrections philosophy of the Youth Corrections Act and in so doing has subverted the clear mandate of the Congress. Ironically, this is not as readily apparent from the legal submissions of counsel as it is from the testimony and statements of the Director and other officials of the Bureau. The position taken by the defendants in their briefs, for example, attempt, in the most strained manner, to shoehorn present policies into the provisions of the YCA, and asserting compliance with the letter and spirit of the Act. At the same time, it is patently clear that Bureau officials have clearly enunciated their dissatisfaction and disenchantment of the YCA. This is illustrated by the following examples and excerpts from the record:

a. "No segregation of YCA offenders from adult offenders was implemented until after judicial intervention or the threat thereof and has been limited to sleeping quarters."[8]

b. "Q. There was no concern then that you might be mixing adults with YCA's at the institution?

A. No more than we've had for the past twenty-some years.

Q. Were you involved in this decision to bring in adults?

A. Yes.

Q. Was the Youth Corrections Act and its limitations, or maybe there were none as far as the executive branch was concerned, brought into focus when the decision was made?

A. I don't think that we felt particularly constrained by the Youth Corrections Act."

(Transcript Elwood Toft, Executive Staff of Bureau, Advisor to Director on Policy, Vol. IV, pp. 100, 101, 102.)

c. " 'The bottom line, very candidly, Mr. Chairman, is I personally believe the Youth Act should be repealed,' and 'While the Youth Corrections Act was a landmark at the time of its passage, we believe that experience and changes which have taken place over the years have caused the Act to outlive its usefulness. We support those provisions of the proposed legislation to revise the Federal Criminal Code which would eliminate the Youth Corrections Act.' Statement of Norman Carlson, Oversight Hearings on Fed. Bureau Policies Regarding Placement of Juveniles and Implementation of the Youth Corrections Act, House Judiciary Committee, October 27, 1978. (at p. 23).

d. " '. . . so that what we're doing today has strayed from the original intent of the Youth Act, I'm sure . . . .' "

---

7. The Court is not unmindful of the prevailing theory that rehabilitation is only accomplished by the individual, that he must be self-motivated in order to successfully rehabilitate himself, that prisons can only provide opportunities so that when he is ready, the inmate will have available to him the facilities and programs which will assist in his quest. I do not intend to discuss the rehabilitation theories nor can I discuss how and when "self-motivation" is born. Suffice it to say, Congress felt that youthful offenders needed guidance and assistance in achieving rehabilitation and that, to me, would include additional efforts and techniques to promote "self-motivation". Of some interest here is the recent symposium of Hofstra, 7 Hofstra L.Rev. 1–138 and 243–470 (1978).

8. The bureau, as a matter of fact, contends segregation is inimical to the best interests of the youth offender; that adult influence is a beneficial contact and reduces the potential for violence or reckless behavior.

(Transcript Elwood Toft, Vol. 14, pg. 85.)

■ With Judge Matsch, this Court commends the candor of those speaking for the Bureau and agrees with him that their sincerity and conviction regarding effective penal programs cannot be impugned. Simply put, current Bureau penal philosophy does not comport with that espoused by the Congress which promulgated the YCA. Whether the current Bureau approach is the most effective or productive or proven is not the issue—the issue is whether, particularly in view of the thorough and detailed investigation by the Congress of the YCA model and its dictates, the Bureau has authority to disregard the spirit and plain language of the Act.

In concert with Judge Matsch in *Watts* and Judge Doyle in *Brown*, this Court holds it cannot, and that recourse must be had to the Congress who may or may not accept the present position of the Bureau and institute any changes it deems advisable or repeal the Act, in toto, as requested by the Director. In the interim, of course, the implementation of the YCA must be pursued.

## PAROLE PRACTICES

The plaintiffs also contend that the policies and practices of the United States Parole Commission violate the provisions and purposes of the YCA as well as denying them equal protection under the law. The same argument with similar responses and evidence were presented to the Court in *Watts v. Hadden, supra.* Since this Court is in agreement with the findings of Judge Matsch, it will adopt the pertinent positions of his Memorandum Opinion and Order and attach them hereto as Appendix A.

■ In sum it appears that the Parole Commission, contrary to the provisions of the YCA, is giving no different consideration to YCA offenders than it does to adult offenders; particularly, it is not assigning any importance or influence to the rehabilitative factor in determining release dates. Rather, the Parole Commission is applying its Parole Guidelines as to both YCA and adult offenders without recognizing that additional factors set forth in the YCA must be utilized and applied to YCA inmates.

## REMEDIES

The plaintiffs herein have offered to submit a detailed proposed remedial order based upon this Court's findings. (Supplemental Memorandum in Support of Plaintiffs' Requests for Findings of Fact and Conclusions of Law.) That would seem to be an appropriate procedure particularly in view of the remedial efforts that may have been undertaken by virtue of the findings and conclusions of the *Brown* and *Watts* cases. Since we are dealing with a systemic situation in the main a comprehensive remedial plan would be indicated in order to avoid conflicting and costly programs. This Court envisions, as a matter of fact, that in view of the prior rulings, the defendants have engaged in meaningful attempts to put themselves in conformance with the YCA and that counsel, working cooperatively will be able to present a mutually acceptable order.

IT IS SO ORDERED.

## APPENDIX A

III. *The Role of the Parole Commission*

The United States Parole Commission was established as an independent agency in the Department of Justice by an Act of Congress in 1976. 18 U.S.C. §§ 4201–4212. The Parole Commission replaced the U. S. Board of Parole. The Commission, composed of nine members appointed by the President, is required under § 4203(a) to promulgate rules and regulations establishing guidelines for the exercise of its power to grant or deny an application or recommendation to parole any eligible prisoner. Under § 4205(a), a prisoner becomes eligible for release on parole after serving one-third of his term, "except to the extent otherwise provided by law." The sentencing judge may alter that eligibility under § 4205(b) by designating a minimum term of less than

one-third of the maximum sentence imposed.

Section 4206 provides as follows:

(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare; subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

(b) The Commission shall furnish the eligible prisoner with a written notice of its determination not later than twenty-to days, excluding holidays, after the date of the parole determination proceeding. If parole is denied such notice shall state with particularity the reasons for such denial.

(c) The Commission may grant or deny release on parole notwithstanding the guidelines referred to in subsection (a) of this section if it determines there is good cause for so doing: PROVIDED, That the prisoner is furnished written notice stating with particularity the reasons for its determination, including a summary of the information relied upon.

(d) Any prisoner, serving a sentence of five years or longer, who is not earlier released under this section or any other applicable provision of law, shall be released on parole after having served two-thirds of each consecutive term or terms, or after serving thirty years of each consecutive term or terms of more than forty-five years including any life term, whichever is earlier: PROVIDED, HOWEVER, That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State or local crime.

Pursuant to the requirement of § 4203(a)(1), the Commission has promulgated guidelines for a national parole policy and it has issued instructions for the use of those guidelines in the Guideline Application Manual on July 25, 1978. Part III of the manual, entitled "Offense Severity Rating" begins with the following instruction:

In applying the guidelines, the offense severity rating shall reflect the overall circumstances of the present offense behavior. Select the offense rating appropriate to the actual offense behavior that occurred. If the actual offense behavior was more severe than the offense of conviction, the severity rating must be explained on the Notice of Action worksheet (in the space provided) by a brief summary of the specific facts that justify the ratings.

Example: Where the offense of conviction is bank larceny, and the actual offense behavior is bank robbery, the Notice of Action would read: 'Your offense has been rated as very *high* severity because you in fact used a threatening note to rob a savings and loan association.' (Document F—Exhibit T–5)

The "actual offense behavior" may be determined from "information in the file" which may be used if it is "persuasive." To be "persuasive", the information must be specific and corroborated by "established facts." The source of the allegation must "appear to be reliable." The manual expressly authorizes the use of information contained in a count of an indictment dismissed as a result of a plea agreement. The only explicit exclusion is that "charges for which a prisoner was acquitted after trial should not be used." (Document F in Exhibit T–5) If the offense is not listed among those set out in the guidelines, it is to be rated according to its similarity with those listed. When an offense behavior can be classified in more than one category, the manual directs the use of that which is more severe.

The second component in the computation of the range of time to be served within the guidelines is the "salient factor score." That is an effort to predict the parole prognosis of prisoners according to what the Commission believes are indications of recidivism, called "salient factors." Seven such factors must be considered. Points are deducted for each factor and the lower the score, the longer the time to be spent in confinement.

Item A involves "previous instances of criminal conduct." While 18 U.S.C. § 5021 of the Youth Corrections Act provides for setting aside the conviction of a youth offender, the manual eliminates that benefit in this language:

> g. Setting aside or removal of juvenile or youth convictions (adjudications) is normally for civil purposes (to remove civil penalties and stigma). Such convictions (adjudications) *are* to be counted for purposes of assessing parole risk. This also applies to adult convictions which were set aside by various methods (including pardons). However, the examiner panel should *not* count convictions (adjudications) which were set aside or pardoned on grounds of innocence. (Document F—Exhibit T–5)

Item B covers prior incarcerations, including commitments to juvenile institutions and residential treatment centers. Item C concerns the age of the offender at first commitment. A person with no prior commitments is given a score of two if he was 26 years or older at the time of the offense, a score of one if he was 18–25 years old, and a score of zero if he was less than eighteen years of age. Thus, youth is a penalty and a youth offender is, by age alone, given a less positive parole prognosis.

Items D, E and F relate to whether or not the offense of commitment involved auto theft, (or checks), whether or not there was a parole revocation, and whether or not the offender has any history of heroin or opiate dependence. The final item considered in computing the salient factor score is the absence of verified employment or full time school attendance.

The manual also is instructive about reasons for going below the guidelines, which occurs in only about ten percent of all cases. Among the eleven reasons given for a reduced range are such mitigating offense factors as duress or diminished mental capacity. Other factors relate to the parole prognosis, (e. q., the fact that the offender has been free of crime for a substantial time since his last offense). A third category of reasons for reduced confinement includes substantial cooperation by the prisoner in assisting the government in the prosecution of other cases and such substantial medical problems as terminal cancer or a heart condition.

The final reason given for considering decisions below the guidelines is called "exceptional institutional program achievement." In the entire manual issued by the Parole Commission for the application of its guidelines, this is the only statement which could conceivably be considered to relate to the kind of institutional progress and individual response to treatment which are emphasized in the Youth Corrections Act. Yet, the manual makes it clear that this factor should only be considered in the rarest of circumstances by stating:

> . . . The prisoner has made a record of clearly exceptional institutional program achievement over a substantial period of time (_____ months). Note: A clear conduct record and good program achievement is expected. This is reserved for cases in which the prisoner's record of program achievement is clearly exceptional, and should be supported by the hearing summary. (Document F—Exhibit T–5)

The Parole Commission consistently has used the same offense severity characteristics and the same salient factors to evaluate both YCA inmates and other prisoners, although the range of time to be served under the guidelines is somewhat less for YCA offenders.

It is apparent from the previous discussion that the Parole Commission has refused to accept and implement the fundamental philosophical concept of the YCA. Ex-

cept in the most unusual circumstances, the inmate's response to rehabilitative treatment is ignored. Because satisfactory institutional conduct is assumed for all offenders, that core concept of the legislative mandate has been cut from parole consideration.

Simply put, the United States Parole Commission has decided that all inmates who come within its jurisdiction should be subject to a determinative sentence. According, each inmate, early in confinement, is given a presumptive parole date indicating the expected time for release, assuming observance of the rules of the institution. Voluntary participation in educational, vocational and other program opportunities has little effect in determining the time to be spent in confinement.